STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF DAKOTA                              FIRST JUDICIAL DISTRICT
                                                   Case Type: Other-Civil

| | |
|---|---|
| Bay Side Recycling Company, LLC and AMG Alliance LLC, | Court File No.: _____ |
| Plaintiffs, | |
| v. | **SUMMONS** <br> **[JURY TRIAL DEMANDED]** |
| SKB Environmental, Inc., Gem-Ash Processing LLC, 4G Group LLC, Christopher J. Goodwald, Matthew Goodwald and Jerry Goodwald, | |
| Defendants. | |

THIS SUMMONS IS DIRECTED TO EACH DEFENDANT LISTED IN THE CAPTION ABOVE.

    1.  **YOU ARE BEING SUED**.  The Plaintiff has started a lawsuit against you.  The Plaintiff's Complaint against you is attached to this Summons.  Do not throw these papers away. They are official papers that affect your rights.  You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this Summons.

    2.  **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS**. You must give or mail to the person who signed this summons **a written response** called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this summons located at:

        Laura N. Maupin and Erin E. Westbrook, Barnes & Thornburg LLP, 225 South Sixth Street, Suite 2800, Minneapolis, MN 55402.

    3.  **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

    4.  **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint.  If you do not want to contest the claims stated in

the Complaint, you do not need to respond.   A default judgment can then be entered against you for the relief requested in the Complaint.

5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.

6. **ALTERNATIVE DISPUTE RESOLUTION.**   The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice.   You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

**BARNES & THORNBURG LLP**

Dated: October 23, 2014

By: */s/ Laura N. Maupin*
    Laura N. Maupin (MN #324942)
    Erin E. Westbrook (MN #393072)
    225 South Sixth Street, Suite 2800
    Minneapolis, MN 55402
    612-333-2111

    Attorneys for Plaintiffs Bay Side Recycling
    Company, LLC and AMG Alliance LLC

STATE OF MINNESOTA

COUNTY OF DAKOTA

DISTRICT COURT

FIRST JUDICIAL DISTRICT
Case Type: Other-Civil

---

Bay Side Recycling Company, LLC and AMG
Alliance LLC,

                    Plaintiffs,

v.

SKB Environmental, Inc., Gem-Ash
Processing LLC, 4G Group L.L.C.,
Christopher J. Goodwald, Matthew Goodwald,
and Jerry Goodwald

                    Defendants.

Court File No.: _____

**COMPLAINT**

---

Plaintiffs, Bay Side Recycling Company, LLC ("Bay Side") and AMG Alliance LLC

("AMG Alliance"), for their Complaint against Defendants, SKB Environmental, Inc. ("SKB"),

Gem-Ash Processing LLC ("Gem-Ash"), 4G Group L.L.C. ("4G"), Christopher J. Goodwald

("C.J. Goodwald"),  Matthew Goodwald, and Jerry Goodwald state and allege as follows:

### THE PARTIES

1.      Bay Side is a Minnesota limited liability company with its principal place of

business at 220 South 39th Avenue West, Duluth, Minnesota 55807.  Bay Side is engaged in the

business of buying, processing and selling both ferrous and non-ferrous metals.

2.      AMG Alliance is a Delaware limited liability company with a principal place of

business at 1303 Red Rock Road in St. Paul, Minnesota 55119.  AMG Alliance is a joint venture

between AMG Resources Corporation and JAZME, LLC, d/b/a Alliance Steel Service Company

1

("Alliance"). AMG Alliance is engaged in the business of buying, processing, and selling both ferrous and non-ferrous metals. Bay Side is an affiliate of Alliance.

3.      On information and belief, SKB is a Minnesota corporation with its principal place of business at 13425 Courthouse Blvd., Rosemount, Minnesota 55068. On information and belief, SKB is a company that manages and recycles waste.

4.      On information and belief, 4G is a Minnesota limited liability company with a principal place of business of 135 Crystal Creek Road, Orono, Minnesota 55356. On further information and belief, C.J. Goodwald and Matthew Goodwald were, at all times relevant hereto, principals of 4G.

5.      On information and belief, Gem-Ash is a Minnesota limited liability company with a principal place of business of 135 Crystal Creek Road, Orono, Minnesota 55356. On information and belief, Gem-Ash is in the business of buying, processing, and selling both ferrous and non-ferrous metals.

6.      On information and belief, C.J. Goodwald is an individual who resides in Minneapolis, Minnesota.

7.      On information and belief, Matthew Goodwald is an individual who resides at 700 North Arm Drive, Mound, Minnesota 55364.

8.      On information and belief, Jerry Goodwald is an individual who resides at 135 Crystal Creek Road, Orono, Minnesota 55356.

## JURISDICTION AND VENUE

9.      Jurisdiction in the State of Minnesota is proper because, among other things,

AMG Alliance has its principal place of business in Minnesota and most of the acts giving rise to

this action occurred in Minnesota.

10.     Venue is appropriate in Dakota County pursuant to Minn. Stat. § 542.09 because

SKB resides in Dakota County.

## FACTUAL BACKGROUND

11.     Bay Side, Alliance, and AMG Alliance all are involved in the scrap metal

recycling business. Specifically, Alliance is in the business of buying, processing, and selling

both ferrous and non-ferrous metals.  Bay Side is also in the business of buying, processing, and

selling both ferrous and non-ferrous metals.  As part of its processing operations, Bay Side

operates a shredder that utilizes eddy current technology to recover valuable non-ferrous metals

from metal-bearing materials.

12.     In 2009, Bay Side hired C.J. Goodwald to work as a yard engineer at its Duluth

facility.  Prior to being hired by Bay Side, C.J. Goodwald had little to no prior experience in the

industry, other than a summer internship at a steel mill.

13.     During the course of his Bay Side employment, C.J. Goodwald rose to the level of

General Manager, the most senior position at Bay Side's Duluth facility.

14.     During his employment with Bay Side, C.J. Goodwald gained access to trade

secrets of Bay Side and its affiliates, including AMG Alliance.  These trade secrets included,

without limitation: (1) pricing information and methods; (2) margins; (3) company suppliers; (4)

3

customers; and (5) detailed information about the Contract and AMG Alliance's purchasing, handling, processing and marketing of the Material.

15.     In 2010, Bay Side also hired Matthew Goodwald, C.J. Goodwald's brother, to work at its Duluth facility.  During the course of his Bay Side employment, Matthew Goodwald rose to a management position with Bay Side.  In that position, Matthew had responsibility for scrap metal sales and purchases for Bay Side's entire Northern Region, including Minnesota, Wisconsin, Iowa, North Dakota and South Dakota.

16.     When he was hired, Matthew Goodwald executed an Employee Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Employment Agreement") with Bay Side.  Pursuant to the terms of the Employment Agreement, during his employment and for a period of one year after the termination of his employment, Matthew Goodwald could not "directly or indirectly engage in any of the following actions (the "Restricted Activities"):

> (a) Own an interest in . . . , manage, operate, join, control, lend money or render financial or other assistance to, or participate in or be connected with, as an officer, employee, partner, stockholder, consultant or otherwise, any entity who is engaged in the scrap metal brokerage/dealer business (including ferrous and/or non-ferrous scrap metals) anywhere within the States of Minnesota, Wisconsin, Iowa, and the Dakotas. . . .

> (b) Induce, solicit, endeavor to entice or attempt to induce any customer, supplier or other business relation of [Bay Side or its affiliates, including AMG Alliance] to cease doing business with [Bay Side or its affiliates, including AMG Alliance], do business with any competitor of [Bay Side or its affiliates, including AMG Alliance], or in any way interfere with the relationship between any such customer, vendor or other business relation of [Bay Side or its affiliates, including AMG Alliance]; or

> (c) Solicit, endeavor to entice away from [Bay Side or its affiliates, including AMG Alliance], or otherwise interfere with the relationship of [Bay Side or its affiliates, including AMG

4

Alliance], any person who is employed by or otherwise engaged to perform services for [Bay Side or its affiliates, including AMG Alliance] (including, but not limited to, any independent sales representatives or organizations), whether for Employee's own account or for the account of any other individual, partnership, firm, corporation or other business organization.

17.     Under the Employment Agreement, Matthew Goodwald also agreed:

[F]rom and after the execution of this Agreement, he or she shall use such Confidential information [of Bay Side and its affiliates, including AMG Alliance] solely in connection with his or her obligations under this Agreement and shall maintain in strictest confidence and shall not disclose any such Confidential Information, directly or indirectly or use such information in any other way. Employee further agrees to take all reasonable steps necessary to preserve and protect the Confidential Information.

18.     Throughout his employment with Bay Side, Matthew Goodwald gained access to trade secrets of Bay Side and its affiliates, including AMG Alliance. These trade secrets included, without limitation: (1) pricing information and methods; (2) margins; (3) company suppliers; (4) customers; and (5) detailed information about the Contract and AMG Alliance's purchasing, handling, processing and marketing of the Material.

## THE TWO KEY CONTRACTS

19.     SKB has a contract with Hennepin County (the "SKB/Hennepin Contract"), to process certain metal-bearing material recovered from Hennepin County's waste. SKB then markets the processed scrap metal for the joint benefit of SKB and Hennepin County. Seventy-five percent of the resulting revenues (net of certain processing fees) are paid back to Hennepin County. The SKB/Hennepin Contract, which continues until October 31, 2015, requires that SKB periodically solicit competitive bids for the sale of the processed scrap metal (the "Material").

5

20.     Since November 1, 2010, AMG Alliance has been SKB's exclusive customer for the Material.  Under the terms of AMG Alliance's and SKB's most recent contract for the purchase of the Material (dated October 28, 2011, and amended June 19, 2012) (the "Contract"), SKB is required to solicit competitive bids for the future sale of the Material. SKB is required to solicit these bids no later than thirty (30) days before the Contract expires.  Under the provisions of the Contract, the current term of the agreement will end on November 1, 2014.

21.     SKB has refused to honor its contractual obligation to solicit competitive bids despite being requested by AMG Alliance to do so.  In August 2014, when AMG Alliance sought information about the bid process from SKB for the sale of the Material following expiration of the Contract, SKB informed AMG Alliance that it was in the process of negotiating a long-term contract with another party and would not bid out that contract.  AMG Alliance requested SKB to allow it to submit an offer notwithstanding the lack of a bid process.  SKB refused.

### THE GOODWALDS' WRONGFUL CONDUCT

22.     Starting no later than early 2013 (approximately one year before C.J. and Matthew Goodwald resigned), C.J. and Matthew Goodwald (the "Goodwalds") began using knowledge gained during their employment with Bay Side to divert the Plaintiffs' Contract with SKB to a new business that they were establishing.

23.     As reflected in the Bay Side's email archives, in January 2013 the Goodwalds began exploring equipment options for their anticipated business venture. On January 16, C.J. Goodwald scheduled a dinner meeting with SGM Magnetics ("SGM") for himself, his brother

and his father, Jerry Goodwald.  SGM is a manufacturer of magnetic and separation equipment

used in the processing and recycling of ferrous and non-ferrous materials.

24.     Bay Side previously had purchased equipment processing equipment from SGM.

Bay Side had no business reason to meet with SGM in early 2013.  C.J. Goodwald did not

inform his Bay Side supervisor, Michael Zweigbaum, of his plans to visit with SGM.  The SGM

meeting took place on February 4, 2013.

25.     On February 5, 2013, Jerry Goodwald (C.J.'s and Matthew's father) emailed

SGM's Mickey Erdos, thanking him for the meeting.  He copied both his sons on the email.  On

February 8, 2013 another SGM employee, Bob Melenick, emailed Jerry, C.J. and Matthew

Goodwald, stating:

> "Jerry, I agree that was a very enjoyable evening.  I'll be in touch to discuss mill
> magnets in the near future.  At least let you see what we offer.  In the present if
> we can answer any questions, Mick and I are at your disposal."

26.     By the summer of 2013, the Goodwalds were solidifying their plans not only with

SGM, but also SKB, AMGA's most important customer.  On July 23, 2013 (six months before

the Goodwalds resigned their employment), Rick O'Gara of SKB/Bolander sent an email to C.J.

Goodwald attaching a "draft" Non-Disclosure Agreement and asked him to forward the email to

Matthew Goodwald.  As O'Gara requested, C.J. Goodwald forwarded the email to his brother.

27.     In September 2013, a Waste Connections email address transmitted a non-

disclosure agreement, dated July 2013.  The document attached to that email reflects that C.J.

Goodwald was the Vice President of 4G, a company established by the four members of the

Goodwald family (C.J., Matthew, and their parents, Jerry and Lorraine).  C.J. Goodwald was

working surreptitiously as the Vice President of 4G at the same time he was Bay Side's General Manager.

28.     In his capacity as Vice President of 4G, C.J. Goodwald executed a non-disclosure agreement between 4G, SKB and SGM referencing the parties' "potential business relationship." C.J. then forwarded that email and attached the non-disclosure agreement to Jerry Goodwald.

29.     On or about August 23, 2013, Mr. O'Gara forwarded Matthew and C.J. Goodwald an email from a Hennepin County representative to SKB. The email regarded a proposal by students from the University of Minnesota for a research project to "determine the cost and feasibility of recovering more metal from the HERC ash." Although they both were Bay Side employees at the time this email was received and although the email related directly to Bay Side's business, neither Matthew Goodwald nor C.J. Goodwald informed Bay Side of this communication or the proposal.

30.     The Goodwalds' surreptitious planning for their own competing business continued in the Fall of 2013, still months before they each resigned from Bay Side. C.J. Goodwald scheduled a meeting between himself, Jerry Goodwald, and SGM for September 3, 2013, "at the landfill."

31.     On September 4, 2013, the Goodwalds scheduled a conference call with John Domke and Rick O'Gara, both of whom are management employees of SKB. The scheduled call did not relate to Bay Side's business relationship with SKB and neither C.J. nor Matthew informed Bay Side of this conference call.

32.     On September 6, 2013, C.J. and Jerry Goodwald exchanged emails attaching handwritten notes. The notes, in part, contain the following statements:

8

- SGM commitment equipment
- SGM will pick up freight to Sarasota
- Letter of intent – Lock SKB to LLC
- Lock up Ash w/ Hennepin to SKB w/ no charge
- Permits required…environment, bldg., other
- Business model
  - Operating Co
  - Management Team
- Invoice 4G – <u>yes</u>

These notes demonstrate that 4G, SGM and SKB had decided to pursue a business venture, consistent with the July 2013 non-disclosure agreement among the same parties. This business venture was unknown by and undisclosed to Plaintiffs.

33.    In a September 20, 2013 email from SKB to Matthew and C.J. Goodwald, SKB transmitted a proposed letter of intent ("LOI"). The letter states:

> SKB ENVIRONMENTAL, INC., a Minnesota corporation ("SKB"), is pleased to submit this letter of intent relating to the proposal of 4G L.L.C., a Minnesota limited liability company ("4G"), to enter into a definitive agreement with SKB to site, construct and operate a ferrous metal extraction facility at SKB's Rosemount industrial waste landfill (the "Proposed Transaction").

The draft LOI is dated October 1, 2013.

34.    In early October 2013, still months before C.J. Goodwald resigned, C.J. and Jerry Goodwald took a trip to New York to meet with "Sims," a large metal recycler, with operations encompassing the buying, processing and selling of ferrous and non-ferrous recycled metals. C.J. charged the trip to his employer, Bay Side.

35.    C.J. and Jerry Goodwald met with representatives of Sims on or about October 7, 2013. There was no legitimate reason related to his Bay Side employment for C.J. Goodwald to meet with Sims. C.J. Goodwald did not inform Bay Side that he was attending a meeting with Sims and Jerry Goodwald.

9

36.     Soon after C.J. and Jerry Goodwald met with Sims in October 2013, C.J. and Matthew Goodwald ceased using Bay Side's email communications to communicate with each other, their father, SKB or SGM regarding their new business venture.

37.     On November 4, 2013, Jerry Goodwald formed another Minnesota limited liability company, Gem-Ash Processing, LLC.  Prior to establishing this company, Jerry Goodwald had communicated with his son, Matthew Goodwald regarding the name of the company they were forming.

38.     On or about November 19, 2013, the Rosemount City Council approved a new five-year interim use permit that "included plans for an enclosed recycling/transfer facility." Upon information and belief, this related to an application made by SKB, which had sought to expand its facility at 13425 Courthouse Boulevard.

39.     Matthew Goodwald resigned from his employment with Bay Side in December 2013.  C.J. Goodwald resigned from his Bay Side employment in January 2014.

40.     Approximately four months later, on or about April 23, 2014, the newly formed Gem-Ash and SKB jointly proposed a recycling facility to the City of Rosemount that would "remove non- ferrous metals from municipal solid waste (MSW) ash at the landfill."  SKB, Gem-Ash, the City of Rosemount, Dakota County and the Minnesota Pollution Control Agency met regarding this joint proposal on April 23, 2014, with C.J. Goodwald representing Gem-Ash. The City approved the proposed recycling facility, with Gem-Ash as its operator, on June 17, 2014.

### THE GOODWALDS HAD ACCESS TO AMG ALLIANCE'S TRADE SECRETS WHILE EMPLOYED BY BAY SIDE

10

41.    As referenced above, while employed by Bay Side, C.J. and Matthew Goodwald had access to trade secrets obtained through their employment, including but not limited to: (1) pricing information and methods; (2) margins; (3) company suppliers; (4) customers; and (5) other information related to AMG Alliance's contractual relationship with SKB and AMG Alliance's methods relating to the purchasing, handling, processing and marketing of the Material.

42.    Upon information and belief, both during their Bay Side employment and since leaving their Bay Side employment, C.J. and Matthew Goodwald have been employed by or otherwise affiliated with two different corporate entities, 4G and Gem-Ash (each of which share an identical corporate address).

43.    Upon information and belief, 4G and Gem-Ash have improperly used, and C.J. and Matthew Goodwald have improperly assisted 4G and Gem-Ash in using, trade secrets learned by C.J. and Matthew Goodwald while they were employed by Bay Side.  C.J. and Matthew Goodwald, and the two entities with which they have been affiliated, have used this information to solicit a contract with SKB.  As a direct result of 4G's, Gem-Ash's, C.J. Goodwald's and Matthew Goodwald's misappropriation, AMG Alliance stands to lose a valuable contract.

44.    Upon information and belief, 4G, Gem-Ash and SKB interfered with C.J. Goodwald's and Matthew Goodwald's employment with Bay Side and otherwise encouraged C.J. Goodwald and Matthew Goodwald to breach duties owed to Plaintiffs.

45.    Upon information and belief, both while employed by Bay Side and since leaving his employment with Bay Side, Matthew Goodwald has been affiliated with or otherwise

11

cooperated with 4G, Gem-Ash and C.J. Goodwald furthering the interests of Gem-Ash, competing with AMG Alliance, soliciting a supplier of AMG Alliance, and in doing so, violating the terms of the Employment Agreement.

46.     Upon information and belief, Matthew Goodwald solicited, endeavored to entice away or otherwise interfered with the relationship of Bay Side and C.J. Goodwald, who was then an employee of Bay Side, and in doing so, violating the terms of the Employment Agreement.

### GEM-ASH AND SKB'S AGREEMENT

47.     Upon information and belief, in May 2014, six months before SKB was obligated to seek competitive bids for the Contract's renewal, Gem-Ash and SKB jointly sought and received approval from the City of Rosemount to open a facility to be operated by Gem-Ash at SKB's property in Rosemount.  Upon further information and belief, Gem-Ash and SKB also jointly sought and received approval of an operating license from Dakota County.

48.     Upon information and belief, SKB and Gem-Ash have agreed upon a proposed contract with a duration of ten years and plan to put this proposed contract in place once Hennepin County has approved a new long-term agreement between SKB and Hennepin County.

49.     Upon information and belief, SKB has improperly tied negotiations for the hauling of ash for Hennepin County to the proposed contract between SKB and Hennepin County for the processing of metal-bearing materials for the recovery of ferrous and non-ferrous metals.

50.     Upon information and belief, Gem-Ash, C.J. Goodwald, Matthew Goodwald and SKB have conspired to prevent AMG Alliance from bidding on the Material upon the expiration of the Contract and to put Gem-Ash in place as SKB's exclusive customer for the Material.

51.     Upon information and belief, 4G's, Gem-Ash's, C.J. Goodwald's and Matthew Goodwald's ability to successfully solicit SKB is contingent on C.J. Goodwald's and Matthew Goodwald's intimate knowledge of the confidential and propriety information to which C.J. Goodwald and Matthew Goodwald gained access by their employment with Bay Side.

52.     Upon information and belief, C.J. Goodwald and Matthew Goodwald wrongfully took possession of sensitive and propriety customer information, supplier information, pricing information and operational information that is key to AMG Alliance's participation in the market for the purchasing, processing and marketing of ferrous and non-ferrous metals.

53.     Upon information and belief, C.J. Goodwald's and Matthew Goodwald's wrongful possession of this proprietary information has already resulted in Gem-Ash's usurping one of AMG Alliance's most valuable supplier.

54.     4G's, Gem-Ash's, C.J. Goodwald's and Matthew Goodwald's wrongful misappropriation and continued possession of proprietary information has caused and will continue to cause irreparable harm to AMG Alliance's ability to operate in the market for the purchasing, processing and marketing of ferrous and non-ferrous materials in the Minnesota region.

## COUNT I
## BREACH OF EMPLOYMENT AGREEMENT (MATTHEW GOODWALD)

55.     Plaintiffs repeat, re-allege, and incorporate herein all of the preceding paragraphs, with the same force and effect as if each were fully set forth herein.

56.     The Employment Agreement between Plaintiffs and Matthew Goodwald is a valid, binding, and enforceable contract.

13

57.     In the Employment Agreement, Matthew Goodwald acknowledged that if he violated the Employment Agreement, Plaintiffs would be entitled to injunctive relief:

> "Employee acknowledges that the Company's remedy at law for any breach or threatened breach . . . will be inadequate. Therefore, the Company shall be entitled to injunctive and other equitable relief restraining Employee from violating those requirements, in addition to any other remedies that may be available to the Company under this Agreement or applicable law."

58.     As set forth previously, Matthew Goodwald has breached his obligations under the Employment Agreement by, upon information and belief, among other things, affiliating with Gem-Ash, an entity that competes directly with Plaintiffs, including competition for the Contract.

59.     Matthew Goodwald has further breached his obligations under the Employment Agreement by, upon information and belief, among other things, using, disclosing and failing to protect Confidential Information gained during his employment with Bay Side.

60.     Matthew Goodwald has further breached his obligations under the Employment Agreement by, upon information and belief, soliciting, endeavoring to entice away or otherwise interfering with Bay Side's relationship with C.J. Goodwald, who was then an employee of Bay Side.

61.     As a direct and proximate result of Matthew Goodwald's breach of the Employment Agreement, Plaintiffs have suffered and will continue to suffer irreparable harm. As a direct and proximate result of Matthew Goodwald's breach of the Employment Agreement, Plaintiffs also have suffered and will continue to suffer damages, in an amount believed to be in excess of $50,000, plus costs and expenses, including reasonable attorneys' fees, the exact amount of which will be determined at trial.

14

## COUNT II
## BREACH OF CONTRACT (SKB)

62.     Plaintiffs repeat, re-allege, and incorporate herein all of the preceding paragraphs, with the same force and effect as if each were fully set forth herein.

63.     The Contract is a valid, binding, and enforceable agreement.

64.     Under the terms of the Contract, SKB is required to solicit competitive bids for the future sale of metal-bearing material prior to the expiration of the current Contract. Specifically, the Contract states: "Thirty days prior to the end of the Term, SKB shall solicit competitive bids for the subsequent bid."

65.     SKB breached its obligations under the Contract by failing to solicit competitive bids and, instead, proposing to award a ten-year contract to Gem-Ash.

66.     As a direct and proximate result of SKB's breach of the Contract, Plaintiffs have suffered and will continue to suffer irreparable harm.  As a direct and proximate result of SKB's breach of the Contract, Plaintiffs also have suffered and will continue to suffer damages, in an amount believed to be in excess of $50,000, plus costs and expenses, including reasonable attorneys' fees, the exact amount of which will be determined at trial.

## COUNT III
## MISAPPROPRIATION OF TRADE SECRETS (4G, SKB, GEM-ASH, C.J. GOODWALD, MATTHEW GOODWALD, JERRY GOODWALD)

67.     Plaintiffs repeat, re-allege, and incorporate herein all of the preceding paragraphs, with the same force and effect as if each were fully set forth herein.

15

68.     Plaintiffs have developed and maintained confidential, proprietary and trade secret information that is encompassed by the provisions of the Minnesota Uniform Trade Secrets Act, MN Stat. § 325C.01 ("MUTSA").

69.     Plaintiffs' trade secret information derives independent economic value, both actual and potential, from not being generally known to others, and not being readily ascertainable through proper means.

70.     Plaintiffs have made appropriate efforts, reasonable in light of its business model, to maintain the secrecy of its trade secret information.

71.     During their employment, C.J. and Matthew Goodwald had access to and utilized Plaintiffs' confidential, proprietary and trade secret information.

72.     C.J. and Matthew Goodwald had a duty not to use or disclose Plaintiffs' trade secrets for the benefit of any entity other than Bay Side.

73.     4G, Gem-Ash, SKB, and Jerry Goodwald knew that C.J. and Matthew Goodwald had a duty not to use or disclose Plaintiffs' trade secrets but induced the Goodwalds' statutory violation and have used the trade secrets it learned from C.J. and Matthew Goodwald.

74.     As a direct and proximate result of C.J. Goodwald's and Matthew Goodwald's violation of their confidentiality obligations and of 4G's, Gem-Ash's and SKB's knowledge and use of Plaintiffs' trade secrets, Plaintiffs have suffered and will continue to suffer irreparable harm.

75.     As a direct and proximate result of SKB's, C.J. Goodwald's, Matthew Goodwald's, 4G's, Gem-Ash's, and Jerry Goodwald's misappropriation of trade secrets, Plaintiffs also have suffered and will continue to suffer damages, in an amount believed to be in

excess of $50,000, plus costs and expenses, including reasonable attorneys' fees, the exact

amount of which will be determined at trial.

## COUNT IV
## BREACH OF FIDUCIARY DUTIES (C.J. GOODWALD, MATTHEW GOODWALD)

76.      Plaintiffs repeat, re-allege, and incorporate herein all of the preceding paragraphs,

with the same force and effect as if each were fully set forth herein.

77.      C.J. and Matthew Goodwald both owed fiduciary duties, including the duty of

confidentiality and the duty of loyalty, to Plaintiffs by virtue of their employment by Plaintiffs.

78.      Plaintiffs took appropriate protective measures to keep certain information

confidential.

79.      C.J. and Matthew Goodwald breached their duty of confidentiality by improperly

using and disclosing Plaintiffs' confidential information and trade secrets.

80.      C.J. and Matthew Goodwald also breached their duty of loyalty by competing

with Plaintiffs prior to leaving their employment with Plaintiffs. Their competitive activities

during their employment included but were not limited to, upon information and belief,

launching a competing business, in part at Plaintiffs' expense; soliciting a contract with SKB;

and seeking tax credits from the State of Minnesota for the purpose of competing with Plaintiffs.

81.      As a direct and proximate result of the breach of fiduciary duties by C.J. and

Matthew Goodwald, Plaintiffs have suffered and will continue to suffer irreparable harm.

82.      As a direct and proximate result of the breach of fiduciary duties by C.J. and

Matthew Goodwald, Plaintiffs suffered and will continue to suffer damages, in an amount

believed to be in excess of $50,000, plus costs and expenses, including reasonable attorneys'

fees, the exact amount of which will be determined at trial.

**COUNT V**
**USURPATION OF CORPORATE OPPORTUNITY (C.J. GOODWALD AND**
**MATTHEW GOODWALD)**

83.     Plaintiffs repeat, re-allege, and incorporate herein all of the preceding paragraphs, with the same force and effect as if each were fully set forth herein.

84.     The opportunity to enter into a contract with SKB was precisely the same business activity in which Plaintiffs were engaged.  Indeed, Plaintiffs had performed such activities for SKB since 2010.

85.     Before C.J. and Matthew Goodwald usurped the opportunity, Plaintiffs had a reasonable expectation of being awarded a renewal of the Contract, the financial ability and resources to implement the opportunity, and the fundamental knowledge, experience, facilities, personnel equipment, and ability to implement the opportunity.

86.     Upon information and belief, while employed by Plaintiffs, C.J. and Matthew Goodwald also had knowledge of, and pursued for their personal benefits while still employed by Plaintiffs in managerial positions, potential additional business opportunities with SKB relating to the processing and marketing of non-ferrous metals.  Plaintiffs had the financial ability and resources, as well as the fundamental knowledge, experience, facilities, personnel equipment, and ability, to implement this opportunity had C.J. and Matthew Goodwald fulfilled their fiduciary obligations to Plaintiffs and informed Plaintiffs of this opportunity.

87.     C.J. and Matthew Goodwald violated the duties of loyalty, good faith, and fair dealing toward Plaintiffs by taking the opportunity to enter into a contract with SKB, and exploiting other new opportunities with SKB, for 4G and Gem-Ash in furtherance of their own personal interests.

18

88.     As a direct and proximate result of the usurpation of the corporate opportunities by C.J. Goodwald and Matthew Goodwald, Plaintiffs have suffered and will continue to suffer irreparable harm.

89.     As a direct and proximate result of the usurpation of the corporate opportunities by C.J. and Matthew Goodwald, Plaintiffs suffered and will continue to suffer damages, in an amount believed to be in excess of $50,000, plus costs and expenses, including reasonable attorneys' fees, the exact amount of which will be determined at trial.

## COUNT VI
## TORTIOUS INTERFERENCE WITH THE EMPLOYMENT AGREEMENT (4G, GEM-ASH, C.J. GOODWALD, SKB, JERRY GOODWALD)

90.     Plaintiffs repeat, re-allege, and incorporate herein all of the preceding paragraphs, with the same force and effect as if each were fully set forth herein.

91.     A valid, binding, and enforceable Employment Agreement between Plaintiffs and Matthew Goodwald exists.

92.     4G, Gem-Ash, C.J. Goodwald, SKB, and Jerry Goodwald knew of the existence of the Employment Agreement between Plaintiffs and Matthew Goodwald.

93.     4G, Gem-Ash, C.J. Goodwald, SKB, Jerry Goodwald intentionally caused Matthew Goodwald to breach the Employment Agreement by soliciting his affiliation with Gem-Ash upon which he would necessarily compete with Plaintiffs for a contract with SKB in violation of his obligations under the Employment Agreement.

94.     The actions taken by 4G, Gem-Ash, C.J. Goodwald, SKB, and Jerry Goodwald to procure Matthew Goodwald's breach of his Employment Agreement were not justified.

19

95.     As a direct and proximate result of the tortious interference by 4G, Gem-Ash, C.J. Goodwald, SKB, and Jerry Goodwald, Plaintiffs have suffered and will continue to suffer irreparable harm.

96.     As a direct and proximate result of the tortious interference by 4G, Gem-Ash, C.J. Goodwald, SKB, and Jerry Goodwald Plaintiffs suffered and will continue to suffer damages, in an amount believed to be in excess of $50,000, plus costs and expenses, including reasonable attorneys' fees, the exact amount of which will be determined at trial.

## COUNT VII
## TORTIOUS INTERFERENCE WITH A CONTRACT (4G, GEM-ASH, C.J. GOODWALD, MATTHEW GOODWALD, JERRY GOODWALD)

97.     Plaintiffs repeat, re-allege, and incorporate herein all of the preceding paragraphs, with the same force and effect as if each were fully set forth herein.

98.     A valid, binding, and enforceable Contract between Plaintiffs and SKB exists and obligates SKB to solicit competitive bids before the expiration of the Contract.

99.     4G, Gem-Ash, C.J. Goodwald, Matthew Goodwald, and Jerry Goodwald knew of the existence of the Contract between Plaintiffs and SKB and that it obligates SKB to solicit competitive bids before the expiration of the Contract.

100.    4G, Gem-Ash, C.J. Goodwald, Matthew Goodwald, and Jerry Goodwald upon information and belief,  intentionally caused SKB to breach the Contract by persuading SKB not to comply with its obligation to solicit competitive bids and to, instead, agree to award Gem-Ash a ten-year contract for the sale of scrap that was, in part, subject to the bid solicitation requirement.

101.    The actions taken by 4G, Gem-Ash, C.J. Goodwald, Matthew Goodwald, and Jerry Goodwald to procure SKB's breach of the Contract were not justified.

102.    As a direct and proximate result of the tortious interference by 4G, Gem-Ash, C.J. Goodwald, Matthew Goodwald, and Jerry Goodwald, Plaintiffs have suffered and will continue to suffer irreparable harm.

103.    As a direct and proximate result of the tortious interference by 4G, Gem-Ash, C.J. Goodwald, Matthew Goodwald, and Jerry Goodwald Plaintiffs suffered and will continue to suffer damages, in an amount believed to be in excess of $50,000, plus costs and expenses, including reasonable attorneys' fees, the exact amount of which will be determined at trial.

**COUNT VIII**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC**
**ADVANTAGE (4G, GEM-ASH, C.J. GOODWALD, MATTHEW GOODWALD, JERRY**
**GOODWALD)**

104.    Plaintiffs repeat, re-allege, and incorporate herein all of the preceding paragraphs, with the same force and effect as if each were fully set forth herein.

105.    Plaintiffs had a reasonable expectation that they would be awarded a renewal of the Contract from SKB to process metal-bearing materials, similar to its prior contracts with SKB, including the Contract.

106.    The contract that Plaintiffs anticipated being awarded by SKB would have provided economic benefits to Plaintiffs.

107.    4G, Gem-Ash, C.J. Goodwald, Matthew Goodwald, and Jerry Goodwald were aware of the contract that Plaintiffs anticipated renewing with SKB and were aware that Plaintiffs reasonably anticipated economic benefits as a result of such contract being awarded to Plaintiffs in the future.

21

108.     4G, Gem-Ash, C.J. Goodwald, Matthew Goodwald, and Jerry Goodwald intentionally and wrongfully interfered with Plaintiffs' reasonable expectation of economic advantage by persuading SKB not to award a renewal of the Contract to Plaintiffs and, instead, to enter into a ten-year contract with Gem-Ash for the work Plaintiffs previously were performing under the Contract.

109.     If not for the intentional, wrongful interference of 4G, Gem-Ash, C.J. Goodwald, Matthew Goodwald, and Jerry Goodwald it is likely that Plaintiffs would have realized the economic benefits of a renewal of the Contract.

110.     As a direct and proximate result of the tortious interference by 4G, Gem-Ash, C.J. Goodwald, Matthew Goodwald, and Jerry Goodwald Plaintiffs have suffered and will continue to suffer irreparable harm.

111.     As a direct and proximate result of the tortious interference by 4G, Gem-Ash, C.J. Goodwald, Matthew Goodwald, and Jerry Goodwald Plaintiffs suffered and will continue to suffer damages, in an amount believed to be in excess of $50,000, plus costs and expenses, including reasonable attorneys' fees, the exact amount of which will be determined at trial.

**COUNT IX**
**CIVIL CONSPIRACY (ALL DEFENDANTS)**

112.     Plaintiffs repeat, re-allege, and incorporate herein all of the preceding paragraphs, with the same force and effect as if each were fully set forth herein.

113.     All Defendants have conspired and joined efforts, by combining with each other and acting in concert with a common purpose, to unlawfully violate C.J. Goodwald's and Matthew Goodwald's obligations to Plaintiffs, misappropriate confidential information, violate

22

Minnesota's Uniform Trade Secrets Act, and tortiously interfere with Plaintiff's Agreement with SKB.

114.    As a direct and proximate result of Defendants' civil conspiracy, Plaintiffs are entitled to damages in an amount believed to be in excess of $50,000, plus costs and expenses, including reasonable attorneys' fees, the exact amount of which will be determined at trial.

**COUNT X**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (4G, GEM-ASH AND SKB)**

115.    Plaintiffs repeat, re-allege, and incorporate herein all of the preceding paragraphs, with the same force and effect as if each were fully set forth herein.

116.    4G, Gem-Ash, SKB, and Jerry Goodwald knew that the C.J. Goodwald and Matthew possessed a significant volume of Plaintiffs' confidential, proprietary information and trade secret information and knew that C.J. Goodwald and Matthew Goodwald. Despite this knowledge, upon information and belief, 4G, Gem-Ash, SKB, and Jerry Goodwald substantially assisted and participated in C.J. Goodwald's and Matthew Goodwald's disclosure and use of this confidential and proprietary information to Plaintiffs' detriment and to 4G's, Gem-Ash's and SKB's benefit.

117.    As such, 4G, Gem-Ash, SKB, and Jerry Goodwald individually or in concert, aided and abetted C.J. Goodwald's and Matthew Goodwald's violation of their fiduciary duties, and in particular their duty of loyalty to Plaintiffs.

118.    As a direct and proximate result of the aiding and abetting breach of fiduciary duties by 4G, Gem-Ash, SKB, and Jerry Goodwald, Plaintiffs suffered and will continue to

23

suffer damages, in an amount believed to be in excess of $50,000, plus costs and expenses, including reasonable attorneys' fees, the exact amount of which will be determined at trial.

## COUNT XI
## ANTITRUST VIOLATIONS (SKB, GEM-ASH)

119.   Plaintiffs repeat, re-allege, and incorporate herein all of the preceding paragraphs, with the same force and effect as if each were fully set forth herein.

120.   SKB has a monopoly on the market for hauling and disposing of waste from Hennepin County.

121.   By proposing a 10-year contract with Gem-Ash to process the Hennepin County waste, SKB and Gem-Ash are improperly tying the hauling of waste and the processing of metal-bearing materials.

122.   The tying arrangement between SKB and Gem-Ash improperly restricts competition in the market for processing of metal-bearing materials.

123.   The improper tying arrangement has an effect on interstate commerce that is not insubstantial.

## COUNT XI
## UNJUST ENRICHMENT (ALL DEFENDANTS)

124.   SKB, 4G, Gem-Ash, Jerry Goodwald, C.J. Goodwald and Matthew Goodwald have, or stand to be, enriched by their unlawful conduct.

125.   Plaintiffs have been damaged by SKB, 4G, Gem-Ash, Jerry Goodwald, C.J. Goodwald and Matthew Goodwald's conduct.

126.   SKB, 4G, Gem-Ash, Jerry Goodwald, C.J. Goodwald and Matthew Goodwald's enrichment, resulting in economic injury to Plaintiffs, was a result of SKB's, 4G's, Gem-Ash's, Jerry Goodwald's, C.J. Goodwald's and Matthew Goodwald's wrongful conduct.

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in its favor and against the Defendants as follows:

1.     A preliminary injunction enjoining Matthew Goodwald and C.J. Goodwald from appropriating for their personal benefits business opportunities properly belonging to Plaintiffs.

2.     A preliminary injunction and permanent injunction, enjoining and restraining Defendant Matthew Goodwald from violating the Employment Agreement.

3.     A preliminary injunction and permanent injunction, enjoining and restraining Defendants SKB, 4G, Gem-Ash, C.J. Goodwald, Matthew Goodwald, and Jerry Goodwald from using or disclosing trade secrets or confidential information.

4.     A preliminary injunction, and permanent injunction enjoining and restraining Defendants from entering into the proposed contract between SKB and Gem-Ash.

5.     A preliminary injunction requiring SKB to maintain the Contract with AMG Alliance until this legal dispute is resolved.

6.     A preliminary and permanent injunction enjoining and restraining Gem-Ash, 4G, Matthew Goodwald, C.J. Goodwald, and Jerry Goodwald from doing any business with SKB relating to the goods and services that were rightfully AMG Alliance's opportunities.

7.     Awarding AMG Alliance the benefit of the corporate opportunity that the Goodwalds usurped.

8.     Awarding money damages against Defendants in an amount in excess of $50,000,

25

plus costs and expenses, including reasonable attorneys' fees, the exact amount of which will be

determined at trial.

    9.     Awarding costs, expenses, and attorneys' fees as otherwise allowed by law.

    10.    Awarding any other appropriate relief as may be available under the law and that

this Court deems just and equitable.

**BARNES & THORNBURG LLP**

Dated: October 23, 2014

By: /s/Laura N. Maupin
    Laura N. Maupin (MN #324942)
    Erin E. Westbrook (#393072)
    225 South Sixth Street, Suite 2800
    Minneapolis, MN 55402
    612-333-2111

    Attorneys for Plaintiffs Bay Side Recycling
    Company, LLC and AMG Alliance LLC