## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Bay Side Recycling Company, LLC and
AMG Alliance LLC,

       Plaintiffs,

       v.

SKB Environmental, Inc., Gem-Ash
Processing LLC, 4G Group, LLC,
Christopher J. Goodwald, Matthew
Goodwald and Jerry Goodwald,

       Defendants.

Civil File No. 14-cv-04550-SRN-LIB

**MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION**

## INTRODUCTION

AMG Alliance LLC ("AMG Alliance") and its affiliate, Bay Side Recycling Company, LLC ("Bay Side") (collectively, "Plaintiffs") seek a Temporary Restraining Order ("TRO"), enjoining Defendants from continuing to engage in illegal, unethical and wrongful conduct. While employed as management-level employees for Bay Side, brothers C.J. Goodwald and Matthew Goodwald (the "Goodwalds") breached their fiduciary obligations to Bay Side and usurped a critical business opportunity upon which Plaintiffs' future economic viability depends. Disregarding their duties of loyalty and confidentiality and engaging in other tortious conduct, the Goodwalds worked surreptitiously with their father, Jerry Goodwald, to establish a competitive business and steal Plaintiffs' most highly valued customer, SKB Environmental, Inc. ("SKB").

While still working for Plaintiffs, the Goodwalds engaged in various secret

activities designed to usurp Plaintiffs' most important business relationship and abscond with Plaintiffs' most valuable business for their personal benefits and the benefit of their newly formed family business, Gem-Ash Processing LLC ("Gem-Ash").  Absent judicial intervention preventing this outcome, Defendants' actions will cripple Plaintiffs' business, with dire consequences for Plaintiffs' 24 employees.

The Court should: a) enjoin C.J. Goodwald and Matthew Goodwald from appropriating for their personal benefits business opportunities properly belonging to Plaintiffs; b) enjoin Matthew Goodwald from violating his employment agreement with Bay Side and extend the term of the employment agreement by one year; c) enjoin C.J. Goodwald and Matthew Goodwald from using or disclosing trade secret, proprietary or confidential information learned during their employment with Plaintiffs; d) enjoin SKB, Gem-Ash, 4G Group LLC, and Jerry Goodwald from using or disclosing trade secret, proprietary or confidential information learned by C.J. Goodwald or Matt Goodwald during their employment with Plaintiffs; e) enjoin SKB and Gem-Ash from entering into their proposed contract; f) order SKB to maintain its existing, unexpired contract with AMG Alliance until the Court has had an opportunity to rule on this Motion and a subsequent Motion for a Permanent Injunction; g) enjoin Gem-Ash, 4G, Matthew Goodwald, C.J. Goodwald, and Jerry Goodwald from doing any business with SKB relating to the goods and services that were rightfully AMG Alliance's opportunities; and h) order SKB and Gem-Ash to assign the contract they entered for non-ferrous and/or ferrous metals from the Hennepin Energy Recovery Center to Plaintiff AMG Alliance. Plaintiffs respectfully request that in the interim, the Court order SKB to maintain its

existing, unexpired contract with AMG Alliance until the Court has had an opportunity to rule on both this TRO/Preliminary Injunction Motion and a subsequent Motion for a Permanent Injunction.  The *status quo* must be preserved until the Parties have an opportunity to conduct discovery and the Court has made a final adjudication of this matter.

## STATEMENT OF FACTS

A.    **The Parties**

The Plaintiffs:   AMG Alliance is a joint venture between AMG Resources Corporation and Alliance Steel Service Company ("Alliance").  Zweigbaum Decl. ¶ 2. [1] Bay Side is a Duluth, Minnesota-based affiliate of AMG Alliance and Alliance. *Id.* AMG Alliance, Alliance and Bay Side all are involved in the scrap metal recycling business. *Id.* Specifically, AMG Alliance, Alliance and Bay Side are in the business of buying, processing, and selling both ferrous and non-ferrous metals[2]. *Id.* at ¶ 3. As part of its scrap processing capabilities, Bay Side operates a shredder that utilizes eddy current technology[3] to recover valuable non-ferrous metals from metal-bearing materials. *Id.* at ¶ 4.  Eddy current technology is complex; in developing eddy current technology, Bay Side learned the difficulties associated with choosing an appropriate eddy current

---

[1] Relevant exhibits are attached to the Declarations of Laura Maupin, Plaintiffs' counsel; Thomas Rogers; or Michael Zweigbaum. Both Michael Zweigbaum and Thomas Rogers are, directly or indirectly, part owners of AMG Alliance, Alliance and Bay Side. Zweigbaum Decl. ¶ 1; Rogers Decl. ¶ 1.

[2] Ferrous metals are iron-based metals, including steel and other iron alloys.  Non-ferrous metals are non-iron-based metals such as copper, aluminum, titanium, magnesium and other alloys that do not have significant iron contents. Zweigbaum Decl. ¶ 3.

[3] Eddy current technology is a means of separating valuable non-ferrous materials from other scrap and waste materials. *Id.* at ¶ 4.

manufacturer and housing the machine as well as with the complex process of configuring the eddy current based on, among other things, speed and order of materials to be processed.  Rogers Decl. ¶ 5.

The Defendants:  C.J. Goodwald and Matthew Goodwald are former employees of Bay Side. Zweigbaum Decl.¶ 5.   Jerry Goodwald is the father of C.J. and Matthew Goodwald and is the Vice President of Operations at Gerdau Long Steel North America ("Gerdau"). SKB Environmental, Inc. ("SKB") operates a landfill in Rosemount, MN. 4G Group L.L.C. ("4G") is a privately held limited liability company owned by C.J. Goodwald and Matthew Goodwald and their parents (Jerry and Lorraine Goodwald) that was established in March 2012.  *See* Maupin Decl. Ex. 1; Rogers Decl. ¶ 8. Gem-Ash is another privately-held company that was established in November 2013 by Jerry Goodwald.  Maupin Decl. Ex. 2

**B.    AMG Alliance's Relationship with SKB**

SKB has a contract with Hennepin County (the "SKB/Hennepin Contract") to process certain metal-bearing material (the "HERC Material") that is recovered from the Hennepin Energy Recovery Center (the "HERC").[4] *See id.* at Ex. 3. After processing the Material, SKB markets the recovered scrap metal for the joint benefit of SKB and Hennepin County and is required to return approximately seventy-five percent of the resulting metal-recovery revenues to Hennepin County (net of certain processing fees). SKB disposes of the ash content of the HERC Material at its Rosemount landfill.  *Id.*

---

[4] The HERC is more commonly known as the Hennepin County "Garbage Burner".  It is located near Target Field.

§ IV, A.  The SKB/Hennepin Contract will expire in approximately one year (October 31, 2015).  *Id.*, Amendment Number 2.

Since November 1, 2010,  AMG Alliance has been SKB's exclusive customer for the scrap metal (the "Material") that SKB recovers from the Material.  Rogers Decl. ¶ 2. AMG Alliance's and SKB's most recent contract for the sale of the Material is dated October 28, 2011 (as amended on June 19, 2012) (the "Contract").  *Id.* and Ex. 1.  The Contract between SKB and AMG Alliance **is scheduled to expire in two days** (on November 1, 2014).  *Id.*  Under the explicit terms of the Contract, SKB was *required* to solicit competitive bids for the future sale of the Material no less than thirty days prior to the expiration of the Contract.  *Id.* at Ex. 1.  The SKB/Hennepin Contract also requires that SKB periodically solicit competitive bids for the sale of the Material.  *Id.*  Until October 28, 2014, SKB utterly ignored these binding contractual obligations and engaged in no efforts to solicit any competitive bids.  *Id.* at ¶ 3.

## C.     Bay Side Employed Both C.J. and Matthew Goodwald

Bay Side hired C.J. Goodwald and Matthew Goodwald to work at its Duluth facility, in 2009 and 2010, respectively.  Zweigbaum Decl. ¶ 6; Rogers Decl. ¶ 4.  C.J. Goodwald's first position was "yard engineer."  Zweigbaum Decl. ¶ 6.  Prior to his employment with Bay Side, C.J. Goodwald had little to no experience in the scrap metal industry, other than a summer internship at Gerdau, a steel mill for which his father, Jerry Goodwald, serves as Vice President, Operations.  *Id.*  During the four years of his employment with Bay Side, C.J. Goodwald received significant training in the scrap metal business. *Id.* at ¶ 7. This training enabled him to be promoted to General Manager

of Bay Side, the highest position at the Duluth facility, a position that he held until his resignation. *Id.* As the General Manager, C.J. Goodwald was a highly trusted employee, with access to a wide variety of information relating to Plaintiffs' businesses, including details of the Contract, Plaintiffs' relationship with SKB, and AMG Alliance's purchasing, handling, processing, and sale of the Material. *Id.* at ¶ 8. C.J. Goodwald was privy to all aspects of Bay Side's and its affiliates' business, including information regarding customers, suppliers, vendors, pricing, and profit and loss margins. *Id.* at ¶ 9. C.J. Goodwald also interacted with Bay Side's customers, including SKB, and in fact was directly responsible for managing Bay Side's relationship with SKB. *Id.*

Bay Side also hired Matthew Goodwald, C.J.'s brother, to work at its Duluth facility in a commercial position, with responsibilities for buying and selling scrap metal. Rogers Decl. ¶ 4. Matthew Goodwald worked for Gerdau, along with his father, Jerry Goodwald, prior to joining Bay Side. *Id.* By the time he resigned voluntarily in December 2013, Matthew Goodwald had become responsible for scrap metal purchases and sales for Bay Side's entire Northern Region, including Minnesota, Wisconsin, Iowa, North Dakota and South Dakota. *Id.*

During their employment with Bay Side, both Matthew Goodwald and C.J. Goodwald had access to nearly all of Plaintiffs' proprietary, confidential, and trade secret information, including but not limited to: (1) pricing information and methods; (2) margins; (3) suppliers; (4) customers; (5) handling and processing methods and technologies and (6) other information, including information related to AMG Alliance's contractual relationship with SKB and AMG Alliance's methods relating to the

purchasing, handling, processing, and marketing of the Material. *Id.* at ¶ 5; Zweigbaum

Decl. ¶ 10.  C.J. Goodwald also had access to information regarding the difficulties of

choosing an appropriate eddy current manufacturer and housing the machine as well as

the complex process of configuring the eddy current based on, among other things, speed

and order of materials to be processed.  Rogers Decl. ¶ 5.

**D.**     **Matthew Goodwald Agreed Not to Compete with Bay Side and AMG Alliance**

When Bay Side hired Matthew Goodwald, he executed an Employee

Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Employment

Agreement").  Rogers Decl. ¶ 6, Ex. 2.  Under the terms of the Employment Agreement,

he agreed that *during his employment* and for a period of *one year after its termination*,

he would not "directly or indirectly engage in any of the following actions (the

'Restricted Activities')":

> (a) Own an interest in . . . , manage, operate, join, control, lend money or render financial or other assistance to, or participate in or be connected with, as an officer, employee, partner, stockholder, consultant or otherwise, any entity who is engaged in the scrap metal brokerage/dealer business (including ferrous and/or non-ferrous scrap metals) anywhere within the States of Minnesota, Wisconsin, Iowa, and the Dakotas. . . .

> (b) Induce, solicit, endeavor to entice or attempt to induce any customer, supplier or other business relation of [Bay Side or its affiliates, including AMG Alliance] to cease doing business with [Bay Side or its affiliates, including AMG Alliance], do business with any competitor of [Bay Side or its affiliates, including AMG Alliance], or in any way interfere with the relationship between any such customer, vendor or other business relation of [Bay Side or its affiliates, including AMG Alliance]; or

(c) Solicit, endeavor to entice away from [Bay Side or its affiliates, including AMG Alliance], or otherwise interfere with the relationship of [Bay Side or its affiliates, including AMG Alliance], any person who is employed by or otherwise engaged to perform services for [Bay Side or its affiliates, including AMG Alliance] (including, but not limited to, any independent sales representatives or organizations), whether for Employee's own account or for the account of any other individual, partnership, firm, corporation or other business organization.

*Id.* Under the Employment Agreement, Matthew Goodwald also agreed to maintain in strictest confidence the "Confidential Information" (a defined term) of Bay Side and its affiliates, including AMG Alliance. *Id.*

**E.** **Matthew Goodwald and C.J. Goodwald Resign Within Two Months of Each Other**

In November 2013, shortly before his December 2013 resignation, Matthew Goodwald met with Thomas Rogers and asked to be released from the restrictive covenants set forth in his Employment Agreement. Rogers Decl. ¶ 7. Mr. Rogers declined this request, but advised Matthew Goodwald that a limited waiver of such restrictive covenants might be considered if Matthew Goodwald identified the specific future position he was seeking, depending on the nature of such position and other relevant factors. *Id.* Matthew Goodwald represented that he did not have a specific opportunity in mind and therefore no such waiver was agreed to. *Id.* Soon after this meeting, Matthew Goodwald resigned his employment. *Id.*

C.J. Goodwald resigned from Bay Side the following month – January 2014. Zweigbaum Decl. ¶ 11.

**F.      The Goodwalds Form 4G Group L.L.C**

Independent of the scrap metal business, Mike Zweigbaum and Thomas Rogers are part owners of a Minneapolis restaurant along with certain investment partners, one of which is 4G Group L.L.C. ("4G").  Rogers Decl. ¶ 8.  4G is a Minnesota limited liability company owned by C.J. Goodwald and Matthew Goodwald, together with their parents, Jerry and Lorraine Goodwald.  *Id.*[5]  4G was formed on March 29, 2012, with Jerry Goodwald as its manager.  Maupin Decl. Ex. 1.

**G.      The Goodwalds and SKB Scheme to Take Over the SKB Business**

Starting no later than early 2013 – while both employed by Bay Side in key management positions and nearly one year prior to their respective resignations – C.J. Goodwald and Matthew Goodwald began using knowledge gained during their employment with Bay Side, including proprietary, confidential and trade secret information, to usurp the Plaintiff's critical business with SKB.  Key evidence, much of it derived from Bay Side's email archives, demonstrates that their efforts directly involved SKB.

The email traffic indicates that, by the summer of 2013 (while still employed as managers of Bay Side), the Goodwalds were already in the advanced stages of actively soliciting business from SKB for their own benefit, including a contract with SKB to

---

[5] Email communications on the Bay Side email accounts corroborate this understanding. *See* Zweigbaum Decl. Exs. 18, 19.

replace AMG Alliance as the customer for the Material. On July 23, 2013 (six months before the Goodwalds resigned their employment), Rick O'Gara, a Division Vice President of SKB, sent an email to C.J. Goodwald attaching a "draft" Non-Disclosure Agreement and asked him to forward the email to Matthew Goodwald. Zweigbaum Decl. Ex. 5. As O'Gara requested, C.J. Goodwald forwarded the email to his brother. *Id.*[6]

Subsequently, on September 13, 2013, Alissa Ugro, an administrative assistant for SKB, emailed C.J. Goodwald a non-disclosure agreement, dated July 15, 2013, among 4G, SKB and SGM Magnetic Corp ("SGM"). Zweigbaum Decl. Ex. 6. SGM is a manufacturer of magnetic and separation equipment used in the processing and recycling of ferrous and non-ferrous materials. *See* http://www.sgmmagnetics.com/. The document, which references the parties' "potential business relationship," shows that although employed by Bay Side at the time, C.J. Goodwald executed such non-disclosure agreement on behalf of 4G as "Vice President" of 4G. Zweigbaum Decl. Ex. 6. C.J. Goodwald forwarded that email, including the attached non-disclosure agreement, to Jerry Goodwald. *Id.*

Additionally, on August 23, 2013, Mr. O'Gara forwarded Matthew Goodwald and C.J. Goodwald an email from a Hennepin County representative to SKB regarding a proposal by students from the University of Minnesota for a research project to "determine the cost and feasibility of recovering more metal from the HERC ash."

---

[6] To date, Plaintiffs have not been able to recover the attachment to that email. Zweigbaum Decl. ¶ 19.

Zweigbaum Decl. Ex. 7.   Though still employed by Bay Side at the time, neither Matthew Goodwald nor C.J. Goodwald informed Bay Side or AMG Alliance of this proposal, even though it could have had a significant impact on AMG Alliance's future business with its long-standing customer, SKB.  *Id.* at ¶ 21.

The Goodwalds' scheming to usurp AMG Alliance's business relationship and business opportunities with SKB continued through the fall of 2013.  C.J. Goodwald scheduled a September 3, 2013 meeting among himself, Jerry Goodwald and SGM "at the landfill."  *Id.* at Ex. 8.  The following day, a conference call titled "Ash Discussion" was scheduled among C.J. Goodwald, Matthew Goodwald, Jerry Goodwald, John Domke and Rick O'Gara.  *Id.* at Ex. 9.  Both Mr. Domke and Mr. O'Gara are listed as "management" on SKB's website. *See* http://www.skbinc.com/about/management.html. Again, there was no legitimate business that C.J. Goodwald or Matthew Goodwald were authorized to conduct on behalf of Plaintiffs that would have allowed them to meet, or have discussions, simultaneously with SKB and Jerry Goodwald.  *Id.* at ¶ 24.  Moreover, while C.J. Goodwald had access to SKB as a customer of Bay Side and Alliance, Matthew Goodwald had no legitimate business purpose for meeting with or having discussions with SKB. *Id.*

On September 6, 2013, C.J. Goodwald and Jerry Goodwald exchanged emails attaching handwritten notes.  The notes, in part, contain the following statements:

- SGM commitment equipment
- SGM will pick up freight to Sarasota
- Letter of intent – Lock SKB to LLC
- Lock up Ash w/ Hennepin to SKB w/ no charge
- Permits required…environment, bldg., other

- Business model
  - Operating Co
  - Management Team
- Invoice 4G – <u>yes</u>

*Id.* at Ex. 10.   While written in short-hand, these notes clearly contemplate a business venture involving C.J. Goodwald and Jerry Goodwald (apparently through their 4G entity) and SKB, with SGM apparently supplying equipment related to such venture. This business venture was unknown to Plaintiffs.  *Id.* at ¶ 26.

The most damning evidence of the Goodwalds' absconding with corporate opportunities of AMG Alliance, while still employed by Bay Side, is a September 20, 2013 email from SKB to Matthew Goodwald and C.J. Goodwald, which includes an attached proposed letter of intent between SKB and 4G.  It states:

> SKB ENVIRONMENTAL, INC., a Minnesota corporation ("SKB"), is pleased to submit this letter of intent relating to the proposal of 4G GROUP L.L.C., a Minnesota limited liability company ("4G"), to enter into a definitive agreement with SKB to site, construct and operate a ferrous metal extraction facility at SKB's Rosemount industrial waste landfill (the "Proposed Transaction").

*Id.* at Ex. 11.  The draft is dated October 1, 2013.  *Id.*

Furthermore, as reflected in the email communications, in furtherance of their plans to appropriate the SKB opportunity for their personal benefits, rather than the benefit of Bay Side and its affiliates, the Goodwalds began exploring equipment options for their anticipated business venture as early as January 2013.  In January 2013, C.J. Goodwald, Matthew Goodwald and Jerry Goodwald exchanged a series of emails related to scheduling a dinner meeting with SGM.  *Id.* at Exs. 1-4. Although Bay Side had previously purchased certain processing equipment from SGM, Bay Side had no business

reason to meet with SGM in early 2013 (and in no event would have had any business reason to involve Jerry Goodwald in any such meeting with SGM). *Id.* at ¶ 17. Moreover, neither C.J. Goodwald nor Matthew Goodwald informed anyone else at Bay Side of such plans to meet with SGM. *Id.* at ¶ 18. The SGM meeting took place on February 4, 2013. *Id.* at Exs. 1-3. Neither C.J. Goodwald nor Matthew Goodwald informed anyone else at Bay Side that this meeting took place. *Id.* at ¶ 18.

In August 2013, C.J. Goodwald and Matthew Goodwald discussed with SKB an opportunity to extract more metal from the HERC waste. Zweigbaum Decl. Ex. 7. Around the time that he signed the Non-Disclosure Agreement with SKB and SGM on behalf of 4G, C.J. Goodwald approached Michael Zweigbaum to obtain permission to take a trip to look at scrap processing equipment that he indicated might be beneficial to Bay Side. *Id.* at ¶ 29. Mr. Zweigbaum authorized that travel on behalf of Bay Side. *Id.* According to C.J. Goodwald's emails, in mid-September 2013, C.J. Goodwald and Jerry Goodwald finalized plans to take a trip to New Jersey in early October 2013 to visit Sims Metals Management's ("Sims") scrap processing facility in Jersey City, New Jersey and to go to dinner with Jim Thompson and Bob Kelman from Sims. *Id.* at Exs. 12-15. Sims "is the world's largest publicly listed metal recycler, with operations encompassing the buying, processing and selling of ferrous and non-ferrous recycled metals." http://www.simsmm.com/About-Us. On the Sims website, Jim Thompson is listed as a member of the Board of Directors and Bob Kelman is listed as a Managing Director. *See* http://www.simsmm.com/About-Us/Meet-Our-Board;   http://www.simsmm.com/About-

Us/Management-Team. The Sims meeting occurred on October 7, 2013. Zweigbaum Decl. Exs. 12-15.

Although Bay Side had authorized C.J. Goodwald to expense the New Jersey trip, *see id.* Ex. 16, based on C.J. Goodwald's representation that he was researching potential new equipment that might benefit Bay Side, on information and belief, the actual purpose of C.J. Goodwald's and Jerry Goodwald's trip to Sims' Jersey City facility was to view equipment, likely manufactured by SGM, for possible use in its venture with SKB. C.J. Goodwald did not inform Bay Side that he was attending a meeting with Sims and Jerry Goodwald. *Id.* at ¶ 34. And yet again, there was no legitimate reason related to his Bay Side employment for C.J. Goodwald to meet with Sims and his father, Jerry Goodwald, jointly. *Id.*

Shortly after C.J. Goodwald and Jerry Goodwald met with Sims, the email traffic on the Bay Side email accounts regarding the Goodwalds' business venture came to an end. Zweigbaum Decl. ¶ 36. But while email traffic halted, the Goodwalds' efforts to steal AMG Alliance's existing business with SKB and appropriate potential new business opportunities with SKB for their personal benefits did not.

**H.    The Conspiracy Continued, Now Involving Gem-Ash Instead of 4G**

On September 16, 2013, while still a Bay Side employee, Matthew Goodwald sent Jerry Goodwald a single-sentence email asking, "Will it look like this….Gem-ASH?" Jerry Goodwald responded promptly, "I like the emphasis, **is that how you want it to look**?" *Id.* at Ex. 17 (emphasis added). This somewhat obscure exchange appears to have foreshadowed the establishment of a new company by the Goodwald family. On

November 4, 2013, Jerry Goodwald formed Gem-Ash. Maupin Decl. Ex. 2.  Also in November 2013, C.J. Goodwald (while still employed by Bay Side), Jerry Goodwald and Lorraine Goodwald each applied for angel investor tax credits from the Minnesota Department of Employment and Economic Development.  Gem-Ash was subsequently granted 2014 Minnesota Angel Tax Credit Qualified Business status pursuant to Minn. Stat. § 116J.8737.

No later than April 23, 2014, SKB and the Goodwalds' new entity, Gem-Ash jointly proposed establishing a recycling facility to the City of Rosemount that would "**remove non-ferrous** (non-magnetic) metals from municipal solid waste (MSW) ash at the landfill."  Maupin Decl. Ex. 7, pp. 33-34 (emphasis added).  SKB, Gem-Ash, the City of Rosemount, Dakota County and the Minnesota Pollution Control Agency met regarding this joint proposal on April 23, 2014, with C.J. Goodwald representing Gem-Ash.  *Id.* The City approved the proposed recycling facility, with Gem-Ash as its operator, on June 17, 2014.  *Id.*, pp. 6-7. Plaintiffs remained unaware of these activities.

In fact, SKB's planning for such recycling facility had been underway since at least the summer of 2013.  On August 27, 2013, SKB applied to the City of Rosemount for a "revision to their Interim Use Permit [IUP] to allow an expansion to their facility at 13425 Courthouse Boulevard from 151 acres of disposal area to 167 acres of disposal area."  *Id.* at Ex. 4.  An Executive Summary from the Rosemount City Council meeting on November 19, 2013, shows that SKB's application included a request that a previously granted approval for a recycling/transfer facility at the site remain in the 2013

IUP. *Id.* at Ex. 5, p. 9.  The City approved a new five-year interim use permit that "included plans for an enclosed recycling/transfer facility."  *Id.* at Ex. 6, p. 2.

**I.**     **SKB Refused to Negotiate Contract Extension with AMG Alliance Until Litigation Commenced.**

In the summer of 2014, Thomas Rogers contacted SKB's John Domke to discuss extension of the Contract or the bid process from SKB for the sale of the Material following expiration of the Contract.  Rogers Decl. ¶ 9.  Mr. Domke indicated to Mr. Rogers that SKB had already negotiated a 10-year extension of the SKB/Hennepin Contract with Hennepin County and also had negotiated a long-term deal with another company to purchase the Material. *Id.* He nonetheless agreed to schedule a meeting between AMG Alliance and SKB for August 7, 2014.  *Id.*  During such meeting, after not receiving clear responses from Mr. Domke about the future status of the Material, Mr. Rogers suggested to Mr. Domke that AMG Alliance could offer an increased price to SKB for the Material if it were granted an extension of the Contract.  *Id.* at ¶ 10.   Mr. Domke again told Mr. Rogers that SKB was in the process of finalizing a long-term contract with another party and would not bid out the Material upon expiration of the Contract. *Id.* at ¶ 11. AMG Alliance requested that it be permitted to submit an offer for the Material notwithstanding the lack of a bid process, and SKB refused.  *Id.*  AMG Alliance, unable to gain additional information from SKB, approached industry contacts and began learning of the business relationship between SKB and Gem-Ash. *Id.* at ¶ 12. SKB informed AMG Alliance that it had no intention to solicit bids, notwithstanding the requirements of the Contract and AMG Alliance's request to submit a bid.  *Id.* at ¶ 13.

Plaintiffs also have discovered that SKB has asked Hennepin County to grant it a 10-year extension to the SKB/Hennepin Contract, which would include not only the marketing of the Material but also the recycling of "**non-ferrous metals** at [its] landfill in Rosemount" (the "New SKB/Hennepin Contract").  The New SKB/Hennepin Contract is proposed to start on January 1, 2015 and expire on December 31, 2025.  The request includes a proposal that SKB "will subcontract with Gem-Ash Processing, LLC of Orono, Minnesota, to install mechanical processing equipment to extract ferrous and nonferrous metals from the ash."  Maupin Decl. Ex. 8, p. 148 (Hennepin County Board Action Request 14-0368, at Page 2 of 3) (emphasis added).

If the New SKB/Hennepin Contract and proposed subcontract with Gem-Ash were to go forward, they would encompass and take over the business AMG Alliance performs for SKB under the Contract.  Zweigbaum Decl. ¶ 40.  Given this fact, on September 26, 2014, Plaintiffs sent cease-and-desist letters to Gem-Ash, C.J. Goodwald, and Matthew Goodwald.  Maupin Decl. Exs. 9-11. In response, on October 1, 2014, Plaintiffs received a letter from Matthew Goodwald.  Maupin Decl. Ex. 12.  Matthew Goodwald claims to have "steadfastly **honored and abided** by" the Employment Agreement since beginning his employment with Bay Side, claims that he has **honored and abided** the Employment Agreement since leaving Bay Side and states that he will continue to "**respect honor and abide**" the Employment Agreement and "any other legal obligations that relate to my former employment with Bay Side Recycling (including its subsidiaries and affiliates.)" *Id.* (emphases added).  These assurances are impossible to reconcile with Matthew

Goodwald's clear breaches of the Employment Agreement that occurred both while he worked at Bay Side and following his termination, as described above.

Plaintiffs commenced this lawsuit on Thursday, October 23, 2014 [Dkt. 1]. Shortly before commencing this lawsuit, counsel for Gem-Ash informed counsel for Plaintiffs that Gem-Ash would no longer pursue the ferrous portion of the New SKB/Hennepin Contract.  Maupin Decl. ¶ 12.  Also, for the first time, on October 28, 2014, AMG Alliance received from SKB an invitation to bid on the ferrous portion of the New SKB/Hennepin Contract.  Rogers Decl. Ex. 3.  This letter states that Hennepin County has approved the New SKB/Hennepin Contract.  *Id*.

**J.**     **Irreparable Harm Will Result from Loss of the Contract**

In the event that SKB and Gem-Ash are allowed to go forward with their plans, AMG Alliance will lose its most valuable business.   Zweigbaum Decl. ¶ 41. The invitation to bid on the ferrous portion of the contract dictates a minimum price for bids. Even if AMG Alliance were to secure the contract at the minimum price mandated in the invitation to bid, it would likely lose money.  Rogers Decl. ¶ 19.  The vast majority of AMG Alliance's net income is derived from the sale of Material procured pursuant to the Contract.  Id. The profit from the Contract enables AMG Alliance to stay in business and otherwise supports AMG Alliance's overall operations.  *Id.*  Given that no other facility in Minnesota (AMG Alliance's service area) generates a fraction of the post incinerator scrap that the HERC does, the Contract provides a unique supply source for AMG Alliance that could not be replaced.  *Id.*  If AMG Alliance loses the Contract, it therefore may be unable to continue operating as a viable going concern.  *Id.*

The cessation of AMG Alliance's operations would have dire consequences for AMG Alliance and its employees. First and foremost, it would result in the loss of 24 jobs in Minnesota. *Id.* Moreover, AMG Alliance would lose significant capital investments, including investments in equipment specifically procured to handle and process the Material. *Id.*

## ARGUMENT

**I.**     **This Court Should Enter a TRO on Plaintiffs' Behalf to Preserve the Status Quo.**

Plaintiffs Bay Side and AMG Alliance respectfully request the Court to issue a TRO and order a preliminary injunction to preserve the *status quo* and prevent irreparable harm to Plaintiffs. The Eighth Circuit has articulated a four-part test when determining whether to issue a preliminary injunction: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)

**A.**     **Plaintiffs Will Suffer Irreparable Harm if Defendants Are Not Enjoined.**

AMG Alliance and Bay Side will suffer irreparable harm if the Employment Agreement is not enforced. Courts generally presume irreparable harm as a result of the breach of a non-competition agreement. *See, e.g., Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085, 1091-92 (D. Minn. 1981). But, even if the harm to Plaintiffs were not

presumed, Plaintiffs can show they have been, and will continue to be, irreparably harmed because of Defendants' conduct.

With respect to each of the six causes of action described above (as well as the other claims set forth in Plaintiffs' Complaint), the first *Dataphase* factor – the threat of irreparable harm – clearly favors Plaintiffs.  As with any TRO or Preliminary Injunction Motion, Plaintiffs merely seek injunctive relief to preserve the *status quo* while Parties have an opportunity to develop the evidence more fully.  If the injunctive relief is denied, in addition to what is stated above, Plaintiffs will be harmed in at least the following ways:

- Matthew Goodwald will have been excused from the promises he made in his reasonable Employment Agreement – promises for which he was well-compensated throughout the duration of his Bay Side employment;

- Plaintiffs' trade secrets will continue to be exposed to third parties, at a significant detriment to AMG Alliance and Bay Side;

- Plaintiffs will lose its most important contract at the end of October 2014, a contract on which its economic viability depends;

- The loss of AMG Alliance's contract with SKB (without ever having the contractually guaranteed right to bid on it) will have multiple consequences: a) Plaintiffs will likely have to halt operations; b) in doing so, Plaintiffs will have to lay off 24 employees; c) Plaintiffs will have lost out on the opportunity to provide a proposal for the recovery for both ferrous and non-ferrous metals that would benefit Hennepin County; and

- Defendants Matthew and C.J. Goodwald, and their newly-formed Gem-Ash entity, will have usurped a critical opportunity from their former employer, the consequences of which may be irremediable.

Moreover, Gem-Ash is a startup entity.  Plaintiffs have little confidence that Gem-Ash will have the resources to pay a money judgment.   The "threat of unrecoverable

economic loss" a result of insolvency can constitute irreparable harm.   *Hollywood Healthcare Corp. v. Deltec, Inc.*, 2004 WL 1118610, at *11 (D. Minn. 2004).   As a result, there is likely to be no adequate remedy available at law even if Plaintiffs' damages could be reduced to a money judgment.

**B.**   **Any Harm Defendants Will Sustain Upon Grant of a TRO or Preliminary Injunction is Minimal.**

The harm to Defendants if a TRO or Preliminary Injunction were granted is minimal.   First, a TRO, particularly if coupled with expedited discovery (which Plaintiffs also seek), would provide all Parties the opportunity to develop and marshal the evidence in support of their respective positions without radical changes to the existing obligations of the Parties.   Second, by virtue of a continuation of the *status quo*, the AMG Alliance/SKB contract would continue under its current terms, without any harm to SKB. SKB will continue to receive the revenues it currently is receiving under the Contract. Third, as a new corporate start-up, which has not yet started to perform under any agreement with SKB, Gem-Ash presumably has not incurred significant expenses to date. Postponing commencement of its activities pending a determination of whether its principals have engaged in wrongful conduct should have no dire consequences for Gem-Ash.   On balance, the irreparable harm to be sustained by Plaintiffs versus the minimal harm Defendants will arguably sustain favors granting a TRO to Plaintiffs.

**C.**   **Plaintiffs Are Likely To Succeed On The Merits.**

Initially, Plaintiffs need establish that they are likely to succeed only on one of their counts to justify weighing this factor in their favor. *See, e.g.*, *Hood Packaging Corp.*

*v. Steinwagner*, CIV. 14-02979 MJD, 2014 WL 4436105 (D. Minn. Sept. 9, 2014) (finding it unnecessary to address whether plaintiff was likely to succeed on third of three counts after finding plaintiff was likely to succeed on first two counts); *Connelly v. ValueVision Media, Inc.*, 393 F. Supp. 2d 767, 776 (D. Minn. 2005) (entering preliminary injunction after finding likelihood of success on only one of eight separate counts). To demonstrate a likelihood of success on the merits, Plaintiffs need only demonstrate a "fair chance of prevailing" on their claims, but…"a court does not decide whether the movant will ultimately win." *Hood Packaging*, 2014 WL 4436105 at *4 (citing *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir.2007); *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). Although Plaintiffs can establish the likelihood of success on all counts in the Complaint, in the interest of brevity, Plaintiffs will address only six of their claims.

1.   <u>Matthew Goodwald and C.J. Goodwald Breached their Fiduciary Duties.</u>

Plaintiffs are likely to succeed on the merits of their claims that Matthew Goodwald and C.J. Goodwald breached their fiduciary duties to Plaintiffs.

   a.   *Duty of Loyalty.*

Under Minnesota law, an employee owes his employer "a duty of loyalty which prohibits him from soliciting the employer's customers for himself, or from otherwise competing with his employer, while he is still employed." *Eaton Corp. v. Giere*, 971 F.2d 136, 141 (1992) (citing *Rehabilitation Specialists, Inc. v. Koering*, 404 N.W.2d 301, 304 (Minn.1987)); *see also Cenveo Corp. v. S. Graphic Sys., Inc.*, 784 F. Supp. 2d 1130, 1136 (D. Minn. 2011).

As explained more fully below in the context of his breach of the Employment Agreement, Matthew Goodwald was actively soliciting AMG Alliance's suppliers for his personal benefit and otherwise directly competing with his employer *during* his employment with Bay Side. Such conduct described constitutes a breach of his duty of loyalty. Specifically, that conduct includes participating in a meeting with representatives of SGM in February 2013; having ownership in 4G, which signed agreements with Plaintiffs' suppliers to compete with Plaintiffs; soliciting Plaintiffs' current customer, SKB; and actively participating in the formation of Gem-Ash, a direct competitor of his employer.

C.J. Goodwald likewise engaged in egregious breaches of his fiduciary duties. Unbeknownst to Plaintiffs, including his then-employer Bay Side, C.J. Goodwald embarked on a business venture to usurp both a long-standing business relationship and a future opportunity of AMG Alliance. His activities included:[7]

- Taking a February 2013 meeting with SGM and Jerry Goodwald;

- Scheduling a September 3, 2013 meeting among himself, Jerry Goodwald and SGM "at the landfill";

- Signing a non-disclosure agreement on behalf of 4G (and listing himself as "Vice President" of 4G) with SKB and SGM and 4G shortly after SKB's Rick O'Gara went to the City of Rosemount, seeking permission to expand the SKB landfill;

- Exchanging drafts of a Letter of Intent between SKB and 4G relating to 4G's proposal "to enter into a definitive agreement with SKB to site,

---

[7] The factual support for each of the allegations described below is set forth in the Statement of Facts above. To avoid unnecessary duplication, the factual support will not be re-cited here.

construct and operate a ferrous metal extraction facility at SKB's Rosemount industrial waste landfill"; and

- Traveling to New Jersey with Jerry Goodwald to visit Sims at Bay Side's expense.

- Identifying an expanded opportunity with SKB (non-ferrous metal recovery) and failing to bring that to his employer's attention.

There was no legitimate business purpose for C.J. Goodwald to have such meetings with SGM or Sims on Plaintiffs' behalf.  This is especially true given Jerry Goodwald's presence at such these meetings because, as discussed previously, even if there were a legitimate purpose otherwise, Plaintiffs would not have permitted Jerry Goodwald's inclusion in such business meetings.

C.J. Goodwald and Matthew Goodwald engaged in all of the above activities *before* Matthew Goodwald resigned in December 2013 and *before* C.J. Goodwald resigned in January 2014.  Moreover, C.J. Goodwald and Matthew Goodwald were in part financing their plans by using Bay Side money and were using confidential information and trade secrets obtained as Bay Side employees.  Both C.J. Goodwald and Matthew Goodwald were therefore in breach of their duty of loyalty to Plaintiffs.

b.    *Duty of Confidentiality.*

Under Minnesota law, even in the absence of a contractual duty, "employees have a common law duty not to use trade secrets or confidential information obtained from their employer." *Eaton*, 971 F.2d at 141 (citing *Jostens, Inc. v. National Computer Sys.*, 318 N.W.2d 691, 701 (Minn. 1982)).

Matthew Goodwald and C.J. Goodwald had access to Plaintiffs' confidential information and trade secrets, including but not limited to: (1) pricing information and methods; (2) margins; (3) company suppliers; (4) customers; (5) other information related to AMG Alliance's contractual relationship with SKB, including AMG Alliance's methods relating to the purchasing, handling, processing, and marketing of the Material, and also including information regarding eddy current technology. Matthew Goodwald and C.J. Goodwald improperly used this confidential and trade secret information to devise a vastly expanded business opportunity and contract with SKB that would be lucrative for those parties while cutting out Plaintiffs – the companies that developed and protected the confidential information and trade secrets.

2.      Defendants usurped AMG Alliance's corporate opportunity.

In conjunction with their breaches of the fiduciary duties of loyalty and confidentiality, C.J. Goodwald and Matthew Goodwald usurped Plaintiffs' corporate opportunity. Usurpation of corporate opportunity requires a plaintiff to show (1) that the business opportunity is also a corporate opportunity; and (2) that the alleged usurper should be held liable because he or she has violated duties of loyalty, good faith, and fair dealing toward the corporation. *Miller v. Miller*, 222 N.W.2d 71, 81 (Minn. 1974).  A business opportunity is a corporate opportunity if it is of "sufficient importance" and "closely related to the existing or prospective opportunity of the corporation." *Id*.

There simply is no question the opportunity with SKB is a corporate opportunity — C.J. Goodwald and Matthew Goodwald stole the very contract Plaintiffs previously had with SKB to perform the very same work.  That the contract between Gem-Ash and

SKB now contemplates including non-ferrous materials does not remove this from the realm of a corporate opportunity; rather it demonstrates the significantly broadened scope of the loss AMG Alliance will sustain if Gem-Ash and SKB are allowed to proceed.  Bay Side and AMG Alliance both were involved in the non-ferrous business in addition to their ferrous activities and had the experience, ability, and desire to undertake the non-ferrous opportunity with SKB that the Goodwalds usurped for their own benefits. Indeed, they worked with and obtained trade secret knowledge regarding the eddy current machine required to separate non-ferrous material at Bay Side. And, as already explained, C.J. Goodwald and Matt Goodwald violated duties of loyalty owed to Plaintiffs in taking the corporate opportunity.  As a result, Plaintiffs are likely to succeed on their claim for usurpation of corporate opportunity.

3.      <u>Matthew Goodwald breached an enforceable Agreement</u>

Plaintiffs are likely to succeed on the merits based on Matthew Goodwald's breach of the employment agreement. Plaintiffs can demonstrate that the Employment Agreement is enforceable and that Matthew Goodwald breached the Employment Agreement.

a.      *The Employment Agreement is enforceable.*

An agreement containing restrictive covenants is enforceable in Minnesota if it: (1) has reasonable terms, *see, e.g.*, *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 361 (Minn. 1998); (2) is no broader than necessary to protect the employer's legitimate interests, *id.*; and (3) is supported by adequate consideration, *see Davies & Davies*

*Agency, Inc. v. Davies*, 298 N.W.2d 127, 130–31 (Minn. 1980).   The Employment

Agreement here satisfies all three conditions.

        i.       The Employment Agreement's terms are reasonable.

Under Minnesota law, a non-competition agreement generally will be upheld if it

is sufficiently limited in temporal, geographic and substantive scope.  *See, e.g.*, *Overholt*

*Crop Ins. Serv. Co., Inc. v. Bredeson*, 437 N.W.2d 698, 703 (Minn. Ct. App. 1989);

*Boston Scientific Corp. v. Duberg*, 754 F. Supp. 2d 1033, 1039 (D. Minn. 2010)

(applying Minnesota law).   Here, the restrictions on Matthew Goodwald's activities are

eminently reasonable.

Temporal Scope:   Mr. Goodwald's Employment Agreement prevents him from

competing with Plaintiffs for a period of *just one year*.   Rogers Decl. Ex. 2, p. A-1 2. This

time frame is well within the permissible period enforced by Minnesota courts.   For

example, agreements that protect the employer's interests for no more than two or three

years generally are found reasonable and, therefore, enforceable.   *See, e.g.*, *Overholt*; 437

N.W.2d at 704 (two-year restriction was reasonable); *see also Duberg*, 754 F. Supp. 2d at

1039 ("[T]he Court has consistently found one-year restrictions that are limited to a

former employee's sales area to be reasonable." (applying Minnesota law)).

Geographic Scope:   With respect to geographic scope, restrictive covenants that

limit competition within the markets where the employee previously worked generally

are upheld.   *See, e.g.*, *Overholt*, 437 N.W.2d at 703 ("Since the geographical scope of this

covenant is limited to the areas in which appellant actually worked for respondent, we

find the restriction is not overbroad when examined in light of its purpose."); *Duberg*, 754 F. Supp. 2d at 1039.

Here, the geographic scope is limited to "the States of Minnesota, Wisconsin, Iowa, and the Dakotas."  Rogers Decl. Ex. 2, A-1 ¶ 2(a). Matthew Goodwald worked with scrap metal suppliers, brokers, dealers, and other similar entities in the Upper Midwest (Minnesota, Wisconsin, Iowa, North Dakota, and South Dakota) throughout his employment with Bay Side. *Id.* at ¶ 4.

Plaintiffs do not seek to prevent Matthew Goodwald from entering markets in which he has no unfair competitive advantage as a result of his position with Bay Side. Similarly, Plaintiffs do not seek to prevent him from earning a living.  Rather, Plaintiffs simply seek to protect their legitimate interests in the markets where Matthew Goodwald has gained a competitive advantage *as a direct result* of his work at Bay Side. The Employment Agreement's geographic scope is sufficiently narrow to accomplish that goal and, therefore, is reasonable.

Substantive Scope:  The substantive scope of the Employment Agreement is equally reasonable.  Plaintiffs do not attempt to prevent Matthew Goodwald from working.  Rather, the Employment Agreement is designed to prevent him from working for a competitor, soliciting Plaintiffs' customers, or soliciting Plaintiffs' employees. *See*, *Metro Networks Communications, Ltd. Partnership v. Zavodnick*, 2003 WL 22959680, at *3-5 (D. Minn. 2003) (court enforced a non-competition agreement with limited substantive restrictions); *Davies*, 298 N.W.2d at 131 (same). In fact, when Matthew Goodwald asked to be released from his Employment Agreement, Mr. Rogers requested

him to identify a specific job prospect outside of Bay Side, informing him that Plaintiffs would consider a limited waiver if he satisfied Plaintiffs' legitimate concerns with respect to unfair competition. Rogers Decl. ¶ 7. Matthew Goodwald never presented Plaintiffs with a specific job opportunity but, rather, falsely insisted he did not have anything in particular in mind. *Id.*

In sum, the Employment Agreement is reasonable, whether evaluated from a temporal, geographical or substantive perspective.  It should be enforced.

        ii.     The Employment Agreement is no broader than necessary to protect the Company's legitimate interests.

A non-competition agreement may properly protect two types of legitimate interests: (1) the employer's goodwill and (2) trade secrets or confidential information. *Roth v. Gamble-Skogmo, Inc.*, 532 F. Supp. 1029, 1031 (D. Minn. 1982).  An employee who has had "significant contact with customers" often will be "in a position to trade on the company's goodwill."  *See Id.*  Here, both factors support enforcement of the Employment Agreement.  Matthew Goodwald had both significant access to Bay Side's customers, allowing him to trade on its goodwill and was privy to a variety of trade secrets or confidential information, including pricing, margins and contract details. Rogers Decl. ¶¶ 5-6.

        iii.    The Employment Agreement is supported by adequate consideration.

A non-competition agreement entered into at the beginning of an individual's employment is *per se* supported by adequate consideration because the employer's offer of employment is contingent upon the employee's execution of the non-competition

agreement. *See, e.g.*, *Overholt*, 437 N.W.2d at 702.  In return for signing the Employment Agreement, Matthew Goodwald was offered a position as the scrap metal buyer for Bay Side.  The Agreement was supported by adequate consideration.

       b.     *Matthew Goodwald breached the Employment Agreement.*

Matthew Goodwald not only breached the Employment Agreement *after* he resigned from Bay Side, but he breached it *throughout* the final year of his Bay Side employment.  Since at least January 2013[8] – 11 months before he resigned – Matthew Goodwald surreptitiously engaged in conduct competitive with Plaintiffs' business.  Even without the benefit of any discovery, Plaintiffs have learned that this conduct included the following activities[9]:

- On February 4, 2013, Matthew Goodwald attended a meeting with his father Jerry Goodwald, his brother C.J. Goodwald, and representatives of SGM.

- Neither Matthew Goodwald nor C.J. Goodwald had a legitimate purpose for meeting with SGM representatives together on Bay Side's behalf, and they certainly had no legitimate purpose for meeting with SGM representatives with Jerry Goodwald present.  They concealed this meeting from their employer.

- Any information exchanged between Bay Side representatives and SGM would have been confidential, proprietary information that should not have been shared in the presence of a third-party such as Jerry Goodwald.

- On July 23, 2013, Rick O'Gara of SKB sent an email to C.J. Goodwald attaching a "draft" Non-Disclosure Agreement and asked him to forward the email to Matthew Goodwald.  As requested, C.J. Goodwald forwarded the email to his brother.  There was no reason for Bay Side and SKB to enter into any form of a Non-Disclosure Agreement.  On September 13, 2013, 4G (which is owned in part

---

[8] The emails relating to the SGM dinner, which Matt was included in, date to January 2013.

[9] The factual support for each of the allegations described below is set forth in the Statement of Facts above.  To avoid unnecessary duplication, the factual support will not be re-cited here.

by Matthew Goodwald) executed a Non-Disclosure Agreement with SKB and SGM.

- On August 23, 2013, Mr. O'Gara forwarded Matthew Goodwald an email from a Hennepin County representative to SKB regarding a proposal by students from the University of Minnesota for a research project to "determine the cost and feasibility of recovering more metal from the HERC ash."

- In September 2013, Matthew Goodwald was involved in the creation of Gem-Ash, including the selection of the "Gem-Ash" name.

- By September 2013, SKB and 4G were exchanging drafts of a Letter of Intent to "construct and operate a ferrous metal extraction facility at SKB's Rosemount industrial waste landfill." Matthew Goodwald is a part owner of 4G (which was a signatory to the Letter of Intent).

- In November 2013, Matthew Goodwald began seeking a release from his Employment Agreement and informed Bay Side he did not have another opportunity in mind.

Given Matthew Goodwald's participation in (at least) the above-mentioned activities, he cannot seriously contend that he was not engaging in the defined "Restricted Activities," *i.e.*, that he did not (a) "[o]wn an interest in . . ., manage, operate, join, control, lend money or render financial or other assistance to, or participate in or be connected with, as an officer, employee, partner, stockholder, consultant or otherwise, any entity who is engaged in the scrap metal brokerage/dealer business" or (b) "[i]nduce, solicit, endeavor to entice or attempt to induce any customer, supplier or other business relation of [AMG Alliance] to cease doing business with [AMG Alliance], do business with any competitor of [AMG Alliance], or in any way interfere with the relationship between any such customer, vendor or other business relation of [AMG Alliance]. *See* Rogers Decl. Ex. 2, p. A-1 ¶ 2(a). Even if the Court accepted Matthew Goodwald's disingenuous representations that since resigning, he "continue[s his] steadfast honoring

and abiding [by] the full context of the [Employment A]greement," *see* Maupin Decl. Ex. 12, he simply cannot say the same about the time period *before* he resigned.  During that time, Matthew Goodwald was actively working to open a competing business in violation of the Employment Agreement and to steal Plaintiffs' current business with SKB, as well as future business opportunities with SKB.  As a direct result of Matthew Goodwald's activities on behalf of himself, 4G and Gem-Ash from January 2013 through September 2013, Plaintiffs are in jeopardy of losing a valuable contract to the company started by Matthew Goodwald and his family.

In sum, Plaintiffs are likely to succeed on the merits of their claim for breach of the Employment Agreement against Matthew Goodwald.

4. <u>Defendants Have Misappropriated Plaintiffs' Trade Secrets.</u>

The Minnesota Uniform Trade Secrets Act ("MUTSA") "allows the protection of certain types of information through an action for misappropriation." *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 897 (Minn. 1983); *see also* Minn. Stat. §§ 325C.01-08. To be entitled to protection under the MUTSA, information must constitute a trade secret, and the defendants must have misappropriated those trade secrets; "trade secret" and "misappropriation" are defined by the MUTSA. *See Electro-Craft*, 332 N.W.2d at 899-901; Minn. Stat. § 325C.01.

a. *Plaintiffs have identifiable trade secrets.*

A trade secret is information that: (1) is not generally known or readily ascertainable; (2) derives independent economic value from its secrecy; and (3) is subject to reasonable efforts by the plaintiff to maintain secrecy. Minn. Stat. § 325C.01, subd. 5;

*Electro-Craft*, 332 N.W.2d at 899-901. Here, Plaintiffs' trade secrets are its: (1) pricing information and methods; (2) margins; (3) company suppliers; (4) customers; and (5) other information related to AMG Alliance's contractual relationship with SKB, including AMG Alliance's methods relating to the purchasing, handling, processing, and marketing of the Material and also including information regarding eddy current technology.

Plaintiffs have used much of the above-identified trade secrets since at least 2010 to bid for the SKB contract.  Since 2010, AMG Alliance has been awarded the SKB contract over other bidders as a result of its development and knowledge of these trade secrets.  If Plaintiffs' trade secrets were public or well-known, other companies could have used that information to out-bid Plaintiffs.  It is precisely because Plaintiffs have maintained the secrecy of their: (1) pricing information and methods; (2) margins; (3) company suppliers; (4) customers; and (5) other information related to AMG Alliance's contractual relationship with SKB, including AMG Alliance's methods relating to the purchasing, handling, processing, and marketing of the Material, that those trade secrets have independent economic value.

Further, as discussed above, C.J. Goodwald had virtually no industry experience before coming to Bay Side.  He gained significant experience in and knowledge regarding eddy current technology in his capacity as Bay Side's employee.  It is a certainty that C.J. Goodwald has utilized that knowledge of eddy current technology to capitalize on the expanded opportunity with SKB to recover precious non-ferrous metals from the HERC waste.

b.      *Defendants have misappropriated Plaintiffs' trade secrets.*

"Misappropriation" is defined in the MUTSA.  See, § 325C.01, subd. 3.   In relevant part, it identifies "improper means" as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* subd 2.

By virtue of their employment with Bay Side, C.J. Goodwald and Matthew Goodwald had a duty to maintain the secrecy of Plaintiffs' trade secrets. *See Eaton*, 971 F.2d at 141.  As a result, they "used improper means to acquire knowledge" of Plaintiffs' trade secrets by breaching their duties to maintain the secrecy of Plaintiffs' trade secrets and using the trade secrets to their own benefit.

SKB, Gem-Ash, 4G, and Jerry Goodwald all knew that C.J. Goodwald and Matthew Goodwald acquired Plaintiffs' trade secrets through improper means.  Indeed, C.J. Goodwald and Matthew Goodwald were members of 4G (which has Jerry Goodwald as its manager) and clearly have an affiliation with Gem-Ash (which also has Jerry Goodwald as its manager).  The Goodwalds' knowledge and wrongful conduct must be imputed to 4G, Gem-Ash, and Jerry Goodwald.  As previously explained, SKB was intimately involved in working with C.J. Goodwald, Matthew Goodwald, and Jerry Goodwald to enter into a Non-Disclosure Agreement and Letter of Intent even during C.J. Goodwald's and Matthew Goodwald's employment with Bay Side.  Indeed, Defendants communicated, at least in part, via C.J. Goodwald's and Matthew

Goodwald's Bay Side email addresses.[10]   There is simply no question that SKB, 4G, Gem-Ash, and Jerry Goodwald each knew C.J. Goodwald and Matthew Goodwald were both employed by Bay Side and, by virtue of their employment, had a duty to maintain the secrecy of Plaintiffs' trade secrets.

Because Defendants used and/or disclosed Plaintiffs' trade secrets improperly under the MUTSA, Plaintiffs are likely to succeed on the merits of this claim.

5.      SKB Breached Its Contract.

Plaintiffs are likely to succeed on the merits of their breach of contract claim against SKB.  The Contract states: "Thirty days prior to the end of the Term, SKB shall solicit competitive bids for the subsequent bid."  Rogers Decl. Ex. 1, p. 2. The Contract was amended in June 2012 to provide a 3-year extended term, ending November 1, 2014. *Id.*, p. 5.  As a result, on or before October 2, 2014, SKB was required to "solicit competitive bids for the subsequent bid."  When Plaintiffs contacted SKB, however, to inquire about submitting a bid for another term of the Contract, SKB informed Plaintiffs it would not be soliciting any competitive bids.  Rogers Decl. ¶ 11.  Rather, as Plaintiffs learned, in derogation of its clear contractual obligations, SKB was planning to enter into a 10-year contract with Gem-Ash for the same services Plaintiffs previously had been providing.  *Id.* at ¶¶ 11-12.  Had SKB solicited competitive bids as it was contractually obligated to do, Plaintiffs likely would have won the contract, given their prior expertise

---

[10] The fact that, in October 2013, Defendants abruptly ceased using Bay Side's electronic communications system and ceased sending each other emails from their Bay Side email addresses relating to SKB is further evidence that they knew they were engaged in wrongful conduct and sought to conceal it from their employer.

with the contract and their knowledge of the trade secrets identified above.  Because SKB did not solicit competitive bids in the time frame set forth in the Contract, Plaintiffs have been damaged; Plaintiffs are likely to succeed on their breach of contract claim.

6.   Defendants' Tortious Interference.

Plaintiffs are likely to succeed on the merits of their three tortious interference claims.  To prove tortious interference with contract, a plaintiff must show: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) intentional procurement of the contract's breach; (4) lack of justification; and (5) damages.  *Metge v. Cent. Neighborhood Improvement Ass'n*, 649 N.W.2d 488, 500 (Minn. Ct. App. 2002). Although tortious interference with prospective economic advantage is intended to "protect different interests" than a claim for tortious interference with a contract, the elements are similar.  *See Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 218 (Minn. 2014).  To prove tortious interference with prospective economic advantage, a plaintiff must show: (1) the existence of a reasonable expectation of economic advantage; (2) the defendant's knowledge of the expectation of economic advantage; (3) intentional interference with the plaintiff's reasonable expectation of economic advantage in a way that is either independently tortious or in violation of a statute or regulation; (4) absent the defendant's wrongful act, it is reasonably probable the plaintiff would have realized the economic advantage; and (5) damages.  *Id.* at 219.

A defendant's conduct must be improper to be held liable for tortious interference. *Hollywood Healthcare Corp. v. Deltec, Inc.*, 2004 WL 1118610, at *6 (D. Minn. 2004) (applying Minnesota law).  Whether the defendant's conduct was improper is based on a

variety of factors, including (1) the nature of the defendant's conduct, (2) motive, (3) the interests of the other with which the defendant's conduct interferes, (4) the interests sought to be advanced by the defendant, (5) the social interests in protecting the freedom of action of the defendant and the contractual interests of the other, (6) the proximity or remoteness of the defendant's conduct to the interference, and (g) the relations between the parties. *Id.* (citing *R.A., Inc. v. Anheuser-Busch, Inc.,* 556 N.W.2d 567, 571 (Minn. Ct. App. 1996)).

As to Plaintiffs' tortious interference claim with Matthew Goodwald's Employment Agreement, there is no question that Gem-Ash, 4G, C.J. Goodwald, and Jerry Goodwald all were aware of the Agreement. Given the ongoing relationship and discussions with SKB, it is likely that SKB also was aware of the Employment Agreement. Despite this knowledge, Gem-Ash, 4G, C.J. Goodwald, Jerry Goodwald, and SKB continued to involve Matthew Goodwald in the improper competitive activities, including the execution of the Non-Disclosure Agreement and the Letter of Intent and the proposed formation of the contract between Gem-Ash and SKB. As already explained, Matthew Goodwald was in breach of the Employment Agreement by engaging in these activities during his employment with Bay Side. Defendants' conduct in procuring the breach was unquestionably improper, as explained *supra*. And such conduct caused damages: Matthew Goodwald's breach facilitated the relationship between SKB and Gem-Ash; without that relationship, it is probable that AMG Alliance would have been able to successfully bid for the SKB contract – not only for the ferrous portion of the contract it has historically serviced, but also for the expanded opportunity to purchase

precious non-ferrous metal.  Plaintiffs are likely to succeed on their claim that Gem-Ash, 4G, C.J. Goodwald, Jerry Goodwald, and SKB tortiously interfered with Matthew Goodwald's Employment Agreement.

With respect to Plaintiffs' claim for tortious interference with the Contract, here again Gem-Ash, 4G, C.J. Goodwald, Matthew Goodwald, and Jerry Goodwald were aware of the Contract.  Indeed it was the very contract the Goodwalds set out to – but ultimately decided not to – steal.  By originally securing a 10-year arrangement with SKB, Gem-Ash—together with 4G, C.J. Goodwald, Matthew Goodwald, and Jerry Goodwald—intentionally procured SKB's breach of the provision requiring SKB to solicit competitive bids 30 days before the expiration of the Contract.  Particularly since significant wrongful conduct between SKB and Gem-Ash took place *during the Goodwalds' employment* with Bay Side, SKB's actions cannot be justified.  And SKB's breach caused damages; absent judicial intervention, Plaintiffs will have lost its most significant contract.

Finally, with respect to Plaintiffs' claim for tortious interference with a prospective economic advantage, based on Plaintiffs' prior relationship with SKB and its expertise in performing the SKB Contract, Plaintiffs reasonably expected to be awarded a renewal of the Contract.  C.J. Goodwald, Matthew Goodwald, Jerry Goodwald, and by extension, Gem-Ash and 4G, were aware that Plaintiffs reasonably expected SKB to award Plaintiffs a renewal of the Contract.  Despite this knowledge, C.J. Goodwald, Matthew Goodwald, and Jerry Goodwald wrongfully interfered with the expected economic advantage by forming an independent relationship with SKB and engaging in

efforts designed to steal the contract and the expanded opportunities afforded under the New SKB/Hennepin Contract for themselves, Gem-Ash, and 4G, all while working for Plaintiffs.  Without such conduct, it is likely that Plaintiffs would have been awarded a new contract with the expanded opportunities afforded Gem-Ash under its prospective long-term subcontract with SKB.  Plaintiffs had the expertise and industry knowledge (including knowledge of eddy current technology) necessary to perform the contract as well as a history of performing the contractual obligations with SKB.  As a result, Plaintiffs were damaged.  Plaintiffs are likely to succeed on their claim for tortious interference with prospective economic advantage.

## D.      Public Interest

The public interest weighs in favor of granting Plaintiffs' motion for a TRO. Minnesota public policy favors "the protection of legitimate business interests in an industry propelled by vigorous *but fair* competition."  *Guidant Sales Corp. v. Niebur*, CIV. 01-1772DWFAJB, 2001 WL 1636502, *8 (D. Minn. Oct. 18, 2001) (applying Minnesota law) (emphasis added).  Minnesota public policy also favors upholding valid contracts.  *See, e.g.*, *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 456 (Minn. Ct. App. 2001); *Arrowhead Elec. Co-op., Inc. v. LTV Steel Min. Co.*, 568 N.W.2d 875, 878 (Minn. Ct. App. 1997).

First, Matthew Goodwald and Plaintiffs signed a contract that clearly delineated the Parties' rights and obligations.  He reaped extensive benefits from that contract in addition to just his salary and benefits, including four years of experience in a close-knit and complex industry.  Public policy supports the enforcement of the promises he made.

Second, there simply is no question that C.J. Goodwald and Matthew Goodwald breached their fiduciary duties and usurped a corporate opportunity.  Beginning almost an entire year before they resigned, C.J. Goodwald and Matthew Goodwald were working towards a venture of their own.  Yet, at the same time, they were still collecting on their substantial salaries and benefits from Plaintiffs.  Public policy certainly does not favor permitting employees to remain employed for nearly a year, receiving a salary, while they make plans to steal their employer's contracts and business opportunities.  Third, SKB similarly breached its contractual obligations to Plaintiffs and interfered with Plaintiffs' contracts and opportunities.  The fourth *Dataphase* factor also weighs in favor of granting Plaintiffs' Motion for a TRO and preliminary injunction.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request the Court to issue a Temporary Restraining Order and Preliminary Injunction.


                                          **BARNES & THORNBURG LLP**


Dated: October 30, 2014              By: /s/ Laura N. Maupin
                                          Laura N. Maupin (MN #324942)
                                          Erin E. Westbrook (MN #393072)
                                          225 South Sixth Street, Suite 2800
                                          Minneapolis, MN 55402
                                          612-333-2111

                                          Attorneys for Plaintiffs Bay Side
                                          Recycling Company, LLC and AMG
                                          Alliance LLC