## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Bay Side Recycling Company, LLC and AMG Alliance LLC, <br><br> Plaintiffs, <br><br> v. <br><br> SKB Environmental, Inc., Gem-Ash Processing LLC, 4G Group, LLC, Christopher J. Goodwald, Matthew Goodwald and Jerry Goodwald, <br><br> Defendants. | Case No. 14-CV-4550 (SRN/LIB) <br><br><br> **MEMORANDUM OPINION AND ORDER** |

Laura N. Maupin and Erin E. Westbrook, Barnes & Thornburg LLP, 225 South Sixth Street, Suite 2800, Minneapolis, MN 55402, for Plaintiffs.

Theresa M. Bevilacqua, Dorsey & Whitney LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for Defendant SKB Environmental, Inc.

Jonathan P. Norrie, Mark R. Bradford, and Christine E. Hinrichs, Bassford Remele, P.A., 33 South Sixth Street, Suite 3800, Minneapolis, MN 55402, for Defendants Gem-Ash Processing, LLC, 4G Group, LLC, Christopher J. Goodwald, and Jerry Goodwald.

Douglas P. Seaton and Martin D. Kappenman, Seaton, Peters & Revnew, P.A., 7300 Metro Boulevard, Suite 500, Minneapolis, MN 55439, for Defendant Matthew Goodwald.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter is before the Court on Plaintiffs Bay Side Recycling Company, LLC's and AMG Alliance LLC's Motion for Expedited Discovery [Doc. No. 10] and Motion for Temporary Restraining Order and Preliminary Injunction [Doc. No. 13].  For the reasons

set forth below, the Court denies the Motion for Expedited Discovery as moot and denies

the Motion for Temporary Restraining Order and Preliminary Injunction.[1]

## II.   BACKGROUND

### A.   The Parties

Plaintiffs Bay Side Recycling Company, LLC ("Bay Side") and AMG Alliance

LLC ("AMG") are involved in the scrap metal recycling business.  (Zweigbaum Decl.

[Doc. No. 17] ¶ 2.)  AMG is a joint venture between AMG Resources Corporation and

Alliance Steel Service Company ("Alliance"), and Bay Side is a Duluth, Minnesota-

based affiliate of AMG.  (Id.)  Plaintiffs buy, process, and sell both ferrous (iron-bearing)

and non-ferrous (non-iron-bearing) metals.  (Id. ¶ 3.)

Defendant SKB Environmental, Inc. ("SKB") is in the waste management industry

and owns and operates a waste disposal service and landfill in Rosemount, Minnesota.

(Domke Decl. [Doc. No. 27] ¶ 2.)  Defendants Christopher J. Goodwald ("CJ") and

Matthew Goodwald ("Matthew") are former employees of Bay Side.  (Zweigbaum Decl.

¶ 5.)  Defendant Jerry Goodwald ("Jerry")[2] is CJ's and Matthew's father and, until

October 31, 2014, was a regional vice president at Gerdau Long Steel NA ("Gerdau").

(See J. Goodwald Decl. [Doc. No. 30] ¶¶ 2, 11, 18.)  Jerry has over thirty years of

experience in the steel industry.  (Id. ¶ 1.)  Jerry and his wife, Lorraine, along with CJ and

Matthew, formed Defendant 4G Group, LLC ("4G Group") in March 2012.  (See Maupin

---

[1]    The following constitutes the Court's findings of fact and conclusions of law, as required by Federal Rules of Civil Procedure 52(a) and 65.

[2]    To avoid confusion, the Court will refer to each "Goodwald Defendant" by his first name.

Decl. [Doc. No. 16], Ex. 1; Rogers Decl. [Doc. No. 18] ¶ 8.)  Jerry is the manager.

(Maupin Decl., Ex. 1.)  In November 2013, Jerry, Lorraine, CJ, and a company called

4G2, LLC (jointly owned by Jerry, Lorraine, and CJ) formed Defendant Gem-Ash

Processing, LLC ("Gem-Ash").  (Maupin Decl., Ex. 2; J. Goodwald Decl. ¶ 19.)

### B.    The Metals Contracts

SKB and Hennepin County are parties to two agreements relevant to this lawsuit.

The first is a contract governing the transportation and disposal of ash from Hennepin

County's Hennepin Energy Resource Co. ("HERC") facility (the "Hennepin County Ash

Contract").  (See Domke Decl. ¶ 5 & Ex. 1.)  The ash that remains after the HERC

facility incinerates waste contains recyclable metals, along with non-recyclable materials.

(Id. ¶ 7.)  Under the Hennepin County Ash Contract, Hennepin County retains the right to

extract the metals but may, at its option, leave the metals in the ash for SKB to extract

and sell for SKB's own benefit.  (See id. ¶ 7 & Ex. 1 § II.11.)  Hennepin County

historically has extracted ferrous metals (which are sometimes mixed with non-ferrous

metals due to the heat from incineration) through the use of magnets.  (See id. ¶¶ 7–8.)

The second agreement, entered into in 2004, governs the terms under which SKB

transports, processes, and sells the ferrous metals recovered from the ash at the HERC

facility (the "Hennepin County Metals Contract").  (See Maupin Decl., Ex. 3, at 1–2.)

Pursuant to the Hennepin County Metals Contract, SKB was required to solicit

competitive bids for the sale of the processed ferrous metals at least once every two

years.  (See id., Ex. 3, at Amendment No. 1.)  Revenues from the sale were divided, with

75% (net of certain fees) remitted to Hennepin County and 25% retained by SKB.  (Id.,

3

Ex. 3, at 10.)  Per its terms, the Hennepin County Metals Contract expired on October 31,

2013, subject to two successive, one-year renewal periods that would take effect

automatically unless one party gave written consent of its intention not to renew.  (Id.,

Ex. 3, at Amendment 2.)

AMG first won the competitive bid required by the Hennepin County Metals

Contract in October 2010.  (See Rogers Decl. ¶ 2; Domke Decl. ¶ 19 & Ex. 2.)  In 2011,

AMG was the only bidder, and its bid was again accepted by SKB.  (Domke Decl. ¶ 21 &

Ex. 3.)  The most recent contract governing the relationship between SKB and AMG (the

"AMG Contract"), dated October 28, 2011, was amended on June 19, 2012, to extend the

term past one year.  (See Rogers Decl., Ex. 1, at 5.)  Between that time and the AMG

Contract's new expiration date of November 1, 2014, AMG was not required to compete

in a bidding process.  (Id.; see Domke Decl. ¶¶ 24–25.)  However, the AMG Contract did

require that SKB—30 days prior to the end of the term—solicit competitive bids for the

next term.  (Rogers Decl., Ex. 1, at 2.)  SKB has never had a contract for metals with Bay

Side.  (Domke Decl. ¶ 28.)

### C.    CJ and Matthew Goodwald's Employment with Bay Side

Bay Side, AMG's affiliate, hired CJ Goodwald in 2009 as a yard engineer.

(Zweigbaum Decl. ¶ 6.)  During his employment, CJ received training in the scrap metal

business and was eventually promoted to General Manager.  (Id. ¶ 7.)  According to

Plaintiffs, as General Manager, CJ was a "highly trusted employee" who had access to

information regarding Plaintiffs' customers, suppliers, vendors, pricing, and profit and

loss margins.  (Id. ¶¶ 8–9.)  In particular, Plaintiffs assert that CJ was responsible for

4

managing Bay Side's relationship with SKB and had access to details regarding AMG's purchasing, handling, processing, and sale of scrap metal.  (Id.)  Plaintiffs also assert that CJ had access to Bay Side's information regarding the difficulty of selecting an eddy current[3] manufacturer and housing the machine, as well as the process of configuring the eddy current.  (Rogers Decl. ¶ 5.)

Contrary to Plaintiffs' assertions, SKB contends that CJ was not responsible for managing SKB's relationship with Bay Side.  (Domke Decl. ¶ 36.)  Similarly, CJ states that his interaction with SKB was limited to working with SKB to transport and dispose of Bay Side's waste.  (C. Goodwald Decl. [Doc. No. 31] ¶¶ 4–5.)  He claims that he did not have any involvement in negotiations between SKB and AMG, has never seen the AMG Contract and does not know its terms, and has never reviewed an AMG customer or pricing list.  (See id. ¶¶ 6–9.)  Rather, CJ contends that his job was to minimize the costs, and maximize the revenue, associated with purchasing scrap and re-selling the processed metals.  (Id. ¶ 3.)  CJ resigned from Bay Side in January 2014.  (Zweigbaum Decl. ¶ 11.)

Bay Side hired Matthew Goodwald in 2010 as an account executive.  (See Rogers Decl. ¶ 6 & Ex. 2; M. Goodwald Decl. [Doc. No. 23] ¶ 15.)  According to Matthew, when Thomas Rogers, who is part-owner of Alliance (which owns Bay Side and is a 50%-owner of AMG), offered Matthew the position, Mr. Rogers told Matthew that he would receive a salary of $65,000 plus moving expenses but did not inform Matthew that

---

[3]    Bay Side operates a shredder that uses eddy current technology to separate and recover non-ferrous metals from other metal-bearing materials.  (Zweigbaum Decl. ¶ 4.)

he would be required to sign a non-competition agreement.  (See Rogers Decl. ¶ 1; M. Goodwald Decl. ¶¶ 4, 6–7.)  Rather, the first time that Matthew recalls seeing or discussing the Employment Agreement was after he accepted the position.  (See M. Goodwald Decl. ¶¶ 7–12.)  Matthew contends that he was first presented with the Employment Agreement on October 18, 2010—his first day of work.  (Id. ¶ 11.)  That is also the day that he signed the Agreement.  (Id.)  However, Michael Zweigbaum, who is also a part-owner of Alliance, asserts that he provided Matthew with a copy of the Employment Agreement on or around October 8, 2010—the day that Matthew was first offered employment with Bay Side.  (Zweigbaum Second Supplemental Decl. [Doc. No. 37] ¶¶ 1, 4.)  Mr. Zweigbaum points to a letter dated October 8 that offers Matthew employment, states that Matthew would be required to enter into a non-competition agreement, and purports to attach a copy of the Employment Agreement.  (Id. ¶ 4 & Ex. 20.)  Although this letter is dated October 8, Matthew's signature "accepting" the terms of employment is dated October 18.  (See id., Ex. 20.)

Pursuant to the Employment Agreement, Matthew agreed to "maintain in strictest confidence" the trade secrets and confidential business information of Plaintiffs during the term of the Agreement.  (Rogers Decl., Ex. 2 ¶ 1.)  Matthew also agreed not to engage, directly or indirectly, in the following activities during the course of his employment and for one year following termination of his employment:

> (a)    Own an interest in . . . , manage, operate, join, control, lend money or render financial or other assistance to, or participate in or be connected with, as an officer, employee, partner, stockholder, consultant or otherwise, any entity who is engaged in the scrap metal brokerage/dealer business (including ferrous and/or non-ferrous

scrap metals) anywhere within the States of Minnesota, Wisconsin, Iowa, and the Dakotas. . . ;

(b)      Induce, solicit, endeavor to entice or attempt to induce any customer, supplier or other business relation of the Company[4] to cease doing business with the Company, do business with any competitor of the Company, or in any way interfere with the relationship between any such customer, vendor or other business relation and the Company; or

(c)      Solicit, endeavor to entice away from the Company, or otherwise interfere with the relationship of the Company, any person who is employed by or otherwise engaged to perform services for the Company (including, but not limited to, any independent sales representatives or organizations), whether for Employee's own account or for the account of any other individual, partnership, firm, corporation, or other business organization.

(Id., Ex. 2 ¶ 2.)

During his employment with Bay Side, Matthew was responsible for the purchase and sale of scrap metal for Bay Side's Northern Region (i.e., Minnesota, Wisconsin, Iowa, North Dakota, and South Dakota).  (Id. ¶ 4.)  Mr. Rogers asserts that Matthew, too, had access to Plaintiffs' information regarding pricing, margins, suppliers, customers, and handling and processing methods and technologies; AMG's contractual relationship with SKB and methods relating to the purchasing and marketing of scrap metal; and Bay Side's information regarding the difficulty of selecting an eddy current manufacturer and housing the machine, as well as the process of configuring the eddy current.  (Id. ¶ 5.) Matthew, on the other hand, states that his job duties were to purchase scrap metal and to call mills for pricing information, and that he did not do business with SKB or have

---

[4]      "Company" is defined as Bay Side and its subsidiaries and affiliates, including Alliance and AMG.  (Rogers Decl., Ex. 2, at A-1.)

access to or specific knowledge of the contracts at issue in this litigation or to AMG's pricing, customer lists, or financial information.  (See M. Goodwald Decl. ¶¶ 15, 19, 22, 30.)

Matthew resigned from Bay Side in December 2013.  (Rogers Decl. ¶ 7.)  He states that he did not take any information with him when he left, has not used any Bay Side information since he left, and has only been employed by companies that work outside of the geographic area of the non-competition agreement or in a different industry.  (M. Goodwald Decl. ¶¶ 23, 25–26.)  He also states that he is not employed by Gem-Ash and has not performed any work for Gem-Ash.  (Id. ¶ 27.)

According to Mr. Zweigbaum, Bay Side, Alliance, and AMG regularly require employees in purchasing and sales positions to execute a confidentiality, non-competition, and non-solicitation agreement as a condition of their employment.  (Zweigbaum Second Supplemental Decl. ¶ 2.)  On the other hand, employees in operational positions typically are not required to enter into such agreements.  (Id. ¶ 3.)  While Mr. Zweigbaum states that approximately twelve current Bay Side, Alliance, and AMG employees are subject to these agreements, (id. ¶ 2), Matthew asserts that he does not believe that any other Bay Side employees were required to sign non-competition agreements during the time that he worked there, (Supplemental M. Goodwald Decl. [Doc. No. 38] ¶ 5).

### D.    Defendants' Allegedly Improper Behavior

According to Plaintiffs, Defendants began attempts to solicit business away from Plaintiffs in 2013, when CJ and Matthew were still employed by Bay Side.  Plaintiffs'

evidence is based primarily on several email communications sent over CJ's and Matthew's Bay Side email accounts.  (See Zweigbaum Decl. ¶ 12.)  For example, Plaintiffs point to a July 23, 2013 email sent by Rick O'Gara of SKB to CJ and attaching a "draft mutual [nondisclosure agreement]."[5]  (Zweigbaum Decl. ¶ 19 & Ex. 5.)  Per Mr. O'Gara's request, CJ forwarded the email to Matthew, who then forwarded the email to Jerry.[6]  (See id.)  Then, on September 13, Alissa Ugro of SKB emailed to CJ a "Mutual Nondisclosure Agreement" between 4G Group, SKB, and SGM.  (Id. ¶ 20 & Ex. 6.)  The Nondisclosure Agreement is dated July 15, 2013, and it was executed by CJ as "Vice President of 4G Group."  (Id., Ex. 6, at 4.)  CJ forwarded the email and attachment to Jerry.  (Id., Ex. 6, at 1.)

Plaintiffs also discovered an email from Mr. O'Gara to CJ and Matthew in August 2013, in which Mr. O'Gara forwarded a message from a Hennepin County employee regarding a proposal for a University of Minnesota research project regarding "metal recovery from the Hennepin County ash."  (Id. ¶ 21 & Ex. 7, at 1.)  Apparently, the data from the study could be used to "determine the cost and feasibility of recovering more

---

[5]   Plaintiffs initially took issue with a meeting between CJ, Matthew, Jerry, and representatives of SGM Magnetics Corporation (one of Plaintiffs' equipment suppliers). (See Pls.' Mem. of Law in Supp. of Mot. for Temp. Restraining Order and Prelim. Inj. [Doc. No. 15] ("Pls.' Mem.") at 12–13; Zweigbaum Decl. [Doc. No. 17] ¶¶ 13–18 & Exs. 1–4.)  In response, CJ, Jerry, and Matthew claimed that the meeting related only to SGM's desire to work with Jerry's company, Gerdau.  (C. Goodwald Decl. [Doc. No. 31] ¶ 18; J. Goodwald Decl. [Doc. No. 30] ¶ 26; M. Goodwald Decl. [Doc. No. 23] ¶ 28.)  At the hearing on this matter, Plaintiffs' counsel acknowledged that Defendants had offered a plausible explanation for that meeting.  Accordingly, the Court will assume that Plaintiffs are no longer claiming that the occurrence of this meeting supports their Motion.

[6]   Mr. Zweigbaum notes that Plaintiffs have been unable to recover the attachment to the email.  (Zweigbaum Decl. ¶ 19.)

metal from the HERC ash."  (Id., Ex. 7, at 1.)  Neither CJ nor Matthew informed Bay

Side or AMG of the proposal.  (Id. ¶ 22.)

      The following month, CJ planned a meeting with Jerry and SGM at "the landfill,"

and Jerry planned a conference call regarding "Ash Discussion" with CJ, Matthew, Mr.

O'Gara, and John Domke of SKB.  (Id. ¶¶ 23–24 & Exs. 8–9.)  According to Mr.

Zweigbaum, there was no business that CJ and Matthew were authorized to conduct on

behalf of Bay Side or AMG that involved Jerry, and Matthew had no business reason for

meeting with SKB at all.  (Id. ¶ 25.)  Shortly after these meetings, Jerry sent CJ an email

attaching handwritten notes that contained the following statements:  "SGM Commitment

Equipment," "Letter of Intent – Lock SKB to LLC," "Lock up ASH w/ Hennepin to SKB

w/ no charge," "Invoice 4G Group – yes," and "Permits required . . . Equipment, Bldg,

other."  (Id. ¶ 26 & Ex. 10, at 2.)  Bay Side and AMG were not aware of any business

endeavor related to these notes.  (Id. ¶ 27.)

      On September 16, 2013, Matthew sent an email to Jerry asking, "Will it look like

this . . . . Gem-ASH[?]"  (Id. ¶ 37 & Ex. 17.)  In response, Jerry stated, "I like the

emphasis – is that how you want it to look?"  (Id.)  Then, on September 17, Mr. Domke

emailed Jerry and attached a letter of intent between SKB and 4G Group dated October 1,

2013 (the "Letter of Intent"), which stated the following:

      SKB ENVIRONMENTAL, INC., a Minnesota corporation ("SKB"),
is pleased to submit this letter of intent relating to the proposal of 4G
GROUP L.L.C., a Minnesota limited liability company ("4G"), to enter into
a definitive agreement with SKB to site, construct and operate a ferrous
metal extraction facility at SKB's Rosemount industrial waste landfill (the
"Proposed Transaction"). . . .

> 4G contemplates the expenditure of significant time and money in connection with analyzing the feasibility of the Proposed Transaction. Accordingly, by SKB's execution of this letter, SKB agrees that, for a period of two hundred seventy-three (273) days after execution of this letter, SKB will not negotiate nor enter into an agreement with any other party with respect to the Proposed Transaction nor any transaction of a substantially similar nature. . . .

(Id. ¶ 28 & Ex. 11, at 2.)  Jerry responded on September 20 with proposed revisions and copied both Matthew and CJ.  (Id., Ex. 11, at 1.)  Matthew states that, after receiving the email, he informed Jerry that he would not be involved in the discussion due to his Employment Agreement.  (M. Goodwald Decl. ¶ 30.)  CJ and Jerry also state that, since that time, Matthew has not been involved with Gem-Ash.[7]  (C. Goodwald Decl. ¶ 22; J. Goodwald Decl. ¶ 18.)

These email communications on CJ's and Matthew's Bay Side email accounts, allegedly regarding the Goodwalds' business venture, ceased in October 2013. (Zweigbaum Decl. ¶ 36.)  As discussed above, Gem-Ash was formed in November 2013, and Matthew and CJ resigned from Bay Side in December 2013 and January 2014, respectively.  Shortly before his resignation, Matthew asked Mr. Rogers to be released

---

[7]    Around this same time, CJ and Jerry exchanged several emails regarding an October 2013 trip to New York to meet with representatives from Sims Metal Management, a scrap-processing company.  (See Zweigbaum Decl. ¶¶ 30–33 & Exs. 12–15.)  CJ had obtained permission from Mr. Zweigbaum to take this trip at Bay Side's expense to look at equipment that might be beneficial to Bay Side.  (See id. ¶¶ 29, 35.) Although Plaintiffs initially expressed concern that the actual purpose of the meeting was for CJ and Jerry to view equipment for use in their business venture with SKB, (see Pls.' Mem. at 14), Mr. Zweigbaum later stated that he understood that Jerry's company, Gerdau, was conducting business with Sims and that CJ merely joined them for dinner, (Zweigbaum Supplemental Decl. [Doc. No. 21] ¶ 2.)  Accordingly, there appears to be no evidence to support Plaintiffs' speculation, and the Court will disregard that meeting for purposes of analyzing Plaintiffs' Motion.

from the restrictive covenants in his Employment Agreement.  (Rogers Decl. ¶ 7.)  Mr.

Rogers informed Matthew that a limited waiver could be considered, depending on the

nature of the new employment opportunity, but Matthew stated that he did not have a

specific opportunity in mind and so no waiver was agreed upon.  (Id.)

On June 17, 2014, Rosemount City Council staff recommended approval of SKB's

proposal to allow Gem-Ash to operate a municipal solid waste recycling facility that

would remove non-ferrous metals from the municipal solid waste ash at SKB's

Rosemount landfill.  (See Maupin Decl., Ex. 7, at 1–2, 5.)  It appears that SKB, Gem-

Ash, the City of Rosemount, Dakota County, and the Minnesota Pollution Control

Agency met as early as April 23, 2014 to discuss this proposal, with CJ representing

Gem-Ash, (see id., Ex. 7, at 33), and that SKB had been contemplating the addition of the

recycling facility by at least November 19, 2013, (see id., Exs. 5–6).

For their part, CJ and Jerry admit that, in the summer of 2013, they began

researching the extraction of metals from incinerator bottom ash in a landfill.  (See C.

Goodwall Decl. ¶¶ 10–12; J. Goodwald Decl. ¶¶ 11–12.)  They learned that no company

was commercially processing incinerated bottom ash in Minnesota, and Jerry believed

there was a unique business opportunity available to do so.  (See C. Goodwall Decl.

¶¶ 12, 14; J. Goodwald Decl. ¶ 13.)  Jerry and CJ then had discussions with SKB about

the possibility of extracting metals from the incinerated bottom ash in SKB's landfill, and

Jerry formed Gem-Ash in November 2013 for that purpose.  (See C. Goodwall Decl.

¶ 15; J. Goodwald Decl. ¶ 15.)  In the meantime, Jerry and CJ assert, they signed the

Nondisclosure Agreement and Letter of Intent in their capacities as officers of 4G Group,

although 4G Group was formed for the express purpose of investing in a restaurant and has not taken any other actions related to the Gem-Ash business venture. (See J. Goodwald Decl. ¶ 27; C. Goodwald Decl. ¶ 20.)

Gem-Ash signed an agreement with SKB on January 23, 2014, which was amended on October 23 (the "Gem-Ash Contract"). (J. Goodwald Decl. ¶ 21.) The Gem-Ash Contract was negotiated by Jerry and, as amended, "is solely for extraction of ferrous and non-ferrous metals from the incinerated bottom ash at SKB's landfill," (C. Goodwald Decl. ¶¶ 16–17), and will not involve metals recovered from the HERC facility, (J. Goodwald Decl. ¶ 21.) CJ claims that he did not provide any confidential AMG or Bay Side information during the negotiation of the contract. (C. Goodwald Decl. ¶ 17.) According to Jerry, Gem-Ash has invested approximately $1.85 million in investigating and developing the process and equipment for its business and has lease obligations relating to the construction of a new facility at SKB's landfill. (J. Goodwald Decl. ¶ 28.) Jerry anticipates that Gem-Ash's revenues will be between $750,000 and $1 million during its first year of operations. (Id.)

For its part, SKB contends that, in late-2013 and early-2014, it began exploring "additional options" with Jerry and Gem-Ash for recovering ferrous and non-ferrous metals from the HERC facility ash. (Domke Decl. ¶ 32.) SKB understood that Gem-Ash provided specialized equipment and techniques that were not available from any other U.S.-based company. (Id. ¶ 33.) SKB states that it did not deal directly with CJ in its discussions and negotiations, and that Matthew was never present at a meeting between

SKB and Gem-Ash nor otherwise involved in SKB's negotiations with Gem-Ash.  (See id. ¶¶ 32, 35.)

### E.      AMG Attempts to Renew Its Contract

During the summer of 2014, Mr. Rogers contacted Mr. Domke to discuss extending the AMG Contract, which was set to expire on November 1.  (Rogers Decl. ¶ 9.)  According to Mr. Rogers, Mr. Domke indicated that SKB had negotiated a ten-year extension of the Hennepin County Metals Contract, as well as a long-term agreement with another company to purchase the HERC metal.  (Id.)  In a subsequent meeting on August 7, Mr. Rogers offered to increase the price that AMG would pay to SKB for the recovered metal if SKB would extend the contract.  (Id. ¶¶ 9–10.)  Mr. Domke again stated that SKB was finalizing a deal with another party and would not accept bids.  (Id. ¶ 11.)  According to Mr. Domke, SKB did not solicit new bids as required under the Hennepin County Metals Contract because Hennepin County was treating that contract as if it would expire at the end of October 2014.  (See Domke Decl. ¶ 38.)

Sometime after this meeting occurred, Mr. Rogers learned about the relationship between SKB and Gem-Ash.  (Rogers Decl. ¶ 12.)  Plaintiffs also learned that SKB's agreement with Hennepin County was to include the "recycling [of] non-ferrous metals at SKB's landfill in Rosemount," and that "SKB will subcontract with Gem-Ash . . . to install mechanical processing equipment to extract ferrous and nonferrous metals from the ash."  (Maupin Decl., Ex. 8, at 148.)  According to SKB, while it had initially proposed that Gem-Ash be incorporated into SKB's contract with Hennepin County, that language ultimately was removed from the final contract.  (See Domke Decl. ¶¶ 39, 41.)

The term of the final agreement runs from January 1, 2015, to December 31, 2025 (the "New Hennepin County Metals Contract"). (Id. ¶ 42 & Ex. 4 § I.) The New Hennepin County Metals Contract does not require SKB to engage in competitive bidding for the sale of the recovered ferrous metals. (Id. ¶ 43.)

After discovering the relationships between CJ, Matthew, Gem-Ash, and SKB, Plaintiffs sent cease-and-desist letters to CJ, Matthew, and Gem-Ash on September 26, 2014. (See Maupin Decl., Exs. 9–11.) Plaintiffs received a response from Matthew on October 1. (See id. ¶ 11 & Ex. 12.) Matthew stated that, both before and after leaving his employment with Bay Side, he "steadfastly honored and abided by" his Employment Agreement. (Id., Ex. 12.) On October 22, counsel for Gem-Ash informed Plaintiffs' counsel that Gem-Ash did not intend to pursue the ferrous portion of the New Hennepin County Metals Contract. (Id. ¶ 12.)

On October 28, Mr. Domke informed AMG that the New Hennepin County Metals Contract had been approved and that SKB would begin accepting proposals for a price for both ferrous and non-ferrous metals recovered from the HERC facility. (Rogers Decl. ¶ 14 & Ex. 3.) However, Mr. Domke stated that SKB would not consider proposals falling under a set minimum price. (Id., Ex. 3.) According to Mr. Rogers, the minimum price is more than nine- to ten-percent greater than the price AMG paid over the past three years. (See id. ¶ 18.)

On October 31, SKB issued a formal Request for Proposals for Purchase of Ferrous Metal Material Recovered From Incinerator Ash (the "RFP"). (Domke Decl. ¶ 47 & Ex. 8.) The RFP contains the same minimum price. (See id.) As of November 6,

five companies had verbally responded and indicated their intent to submit a proposal that meets or exceeds the minimum price requirement.  (Supplemental Domke Decl. [Doc. No. 36] ¶¶ 2–4.)  Neither AMG nor Bay Side was one of those companies.  (See id. ¶ 3.)

### F.      Harm Resulting from Loss of the AMG Contract

Plaintiffs contend that if the New Hennepin County Metals Contract and the Gem-Ash Contract are allowed to go forward, they will subsume the business that AMG performed under the AMG Contract.  (Zweigbaum Decl. ¶ 40.)  According to Plaintiffs, there is no other facility in Minnesota (which is AMG's service area) that is comparable to HERC in terms of the amount of post-incinerator scrap generated, and so "the Contract provides a unique supply source for AMG that could not be replaced."  (Id. ¶ 41.) Therefore, without the contract, Plaintiffs would "lose significant capital investments" and "likely would have to cease operations" and lay off twenty-four employees.  (Id. ¶ 42.)  Moreover, Plaintiffs contend, even if AMG were to obtain the new contract at the minimum price, AMG "would likely lose money" and be unable to continue operating. (Rogers Decl. ¶¶ 19–20.)

### G.      The Claims and Procedural History

On October 23, 2014, Plaintiffs filed a lawsuit against Defendants in Minnesota state court.  (Notice of Removal [Doc. No. 1] ¶ 1.)  Defendants CJ and Jerry Goodwald, 4G Group, and Gem-Ash removed the action to this Court on October 29.  (Id. at 1.) Defendants SKB and Matthew Goodwald consented to removal.  (Id. ¶ 7 & Ex. D.)

Plaintiffs assert twelve claims in their Complaint: breach of the Employment Agreement against Matthew (Count I); breach of contract against SKB (Count II); misappropriation of trade secrets against all Defendants (Count III); breach of fiduciary duties against CJ and Matthew (Count IV); usurpation of corporate opportunity against CJ and Matthew (Count V); tortious interference with the Employment Agreement against 4G Group, Gem-Ash, CJ, SKB, and Jerry (Count VI); tortious interference with contract against 4G Group, Gem-Ash, CJ, Matthew, and Jerry (Count VII); tortious interference with prospective economic advantage against 4G Group, Gem-Ash, CJ, Matthew, and Jerry (Count VIII); civil conspiracy against all Defendants (Count IX); aiding and abetting breach of fiduciary duty against 4G Group, Gem-Ash, and SKB (Count X); antitrust violations against SKB and Gem-Ash (Count XI); and unjust enrichment against all Defendants (Count XII). (Compl. [Doc. No. 1-1] ¶¶ 55–126.) Plaintiffs seek both injunctive relief and damages. (Id. at 25–26.)

Plaintiffs filed their Motion for Temporary Restraining Order and Preliminary Injunction in this Court on October 30. They submitted a memorandum of law [Doc. No. 15], along with the declarations of Laura Maupin [Doc. No. 16], Michael Zweigbaum [Doc. Nos. 17, 21], and Thomas Rogers [Doc. No. 18]. Plaintiffs seek to enjoin CJ and Matthew from appropriating Plaintiffs' business opportunities; enjoin Matthew from violating his Employment Agreement and extend the length of the Agreement for a period of one year; enjoin Defendants from using or disclosing Plaintiffs' trade secrets and confidential information; enjoin SKB and Gem-Ash from entering into their proposed contract; require SKB to maintain its contract with AMG until the Court

17

determines whether a permanent injunction is appropriate; enjoin Gem-Ash, 4G Group, Matthew, CJ, and Jerry from doing business with SKB relating to AMG's business opportunities; and require SKB and Gem-Ash to assign to AMG their contract for metals from HERC.  (See Mot. for Temp. Restraining Order and Prelim. Inj. [Doc. No. 13] ¶¶ 1–9.)

In opposition, Matthew Goodwald submitted a memorandum [Doc. No. 22] and declaration [Doc. No. 23].  SKB filed a separate opposition memorandum [Doc. No. 25], along with the declarations of Theresa Bevilacqua [Doc. No. 26] and John Domke [Doc. No. 27].  And, the remaining Defendants filed an opposition memorandum [Doc. No. 28] and the declarations of Jonathan Norrie [Doc. No. 29], Jerry Goodwald [Doc. No. 30], and CJ Goodwald [Doc. No. 31].

The parties also briefed Plaintiffs' Motion for Expedited Discovery [Doc. Nos. 12, 22, 24, 32], and both Motions were heard on November 6.  Plaintiffs withdrew their Motion for Expedited Discovery at the hearing.  Accordingly, that Motion is denied as moot.  The parties were permitted to submit supplemental declarations regarding Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction after the hearing [Doc. Nos. 36–38].  That Motion is discussed below.

## III.   DISCUSSION

Plaintiffs move pursuant to Rule 65 of the Federal Rules of Civil Procedure for a temporary restraining order and preliminary injunction.  Because Defendants received notice and the Motion was fully briefed by the parties, the Court will treat Plaintiffs' Motion as one for a preliminary injunction pursuant to Rule 65(a).  "A preliminary

injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (citation omitted).  A district court must consider four factors in determining whether preliminary injunctive relief is warranted: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest." Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (citing Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981)).  In analyzing these factors, "'a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene.'" Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999) (quoting United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998)).  The burden of establishing the four Dataphase factors lies with the moving party.  Watkins Inc., 346 F.3d at 844 (citation omitted).

### A.      Likelihood of Success

"[A]n injunction cannot issue if there is no chance of success on the merits."  Mid-Am. Real Estate Co. v. Iowa Realty Co., 406 F.3d 969, 972 (8th Cir. 2005) (citations omitted).  However, the question is not whether the moving party has "'prove[d] a greater than fifty percent likelihood that he will prevail.'"  PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1143 (8th Cir. 2007) (quoting Dataphase Sys., Inc., 640 F.2d at 113). Rather, the question is whether any of the movant's claims provides "fair ground for litigation."  Watkins Inc., 346 F.3d at 844 (citation and internal quotation marks omitted).

Thus, in order to obtain a preliminary injunction, the moving party must show that he has a "fair chance of prevailing" on his claims.  <u>Planned Parenthood Minn., N.D., S.D. v. Rounds</u>, 530 F.3d 724, 732 (8th Cir. 2008).

Although Plaintiffs contend that they are likely to succeed on all counts of their Complaint, they focus on the following claims for purposes of this Motion: misappropriation of trade secrets, usurpation of corporate opportunity, breach of the Employment Agreement, breach of fiduciary duties, breach of the AMG Contract, and tortious interference.  (Pls.' Mem. of Law in Support of Mot. for Temp. Restraining Order and Prelim. Inj. [Doc. No. 15] ("Pls.' Mem.") at 22–39.)  The Court finds that—at this stage of the litigation, and on this record—Plaintiffs have not shown a sufficient likelihood of success against Defendants on any of those claims to justify imposition of the requested injunctive relief.  Discovery may produce more support for Plaintiffs' allegations and, if so, a likelihood of success on the merits.  Based on this incomplete record, however, injunctive relief is not justified.

### 1.     Misappropriation of trade secrets

In Count III, Plaintiffs allege misappropriation of trade secrets under the Minnesota Uniform Trade Secrets Act ("MUTSA") against all Defendants.  (Compl. ¶¶ 67–75.)  "To qualify as a trade secret under [the MUTSA], '(1) the information must not be generally known nor readily ascertainable; (2) the information must derive independent economic value from secrecy; [and] (3) the plaintiff must make reasonable efforts to maintain secrecy.'"  <u>Strategic Directions Grp., Inc. v. Bristol-Myers Squibb Co.</u>, 293 F.3d 1062, 1064 (8th Cir. 2002) (quoting <u>Widmark v. Northrup King Co.</u>, 530

N.W.2d 588, 592 (Minn. Ct. App. 1995)); see Minn. Stat. § 325C.01, et seq. "To succeed on a trade secret misappropriation claim, a plaintiff must first define its alleged trade secrets with sufficient specificity." Hutchinson Tech. Corp. v. Magnecomp Corp., Civ. No. 06-1703 (JNE/SRN), 2006 WL 2061707, at *5 (D. Minn. July 17, 2006) (citing Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 898 (Minn. 1983)). Thus, where a plaintiff fails to identify specific trade secrets or provide specific information about those trade secrets, the plaintiff cannot demonstrate a likelihood of success on the merits of its misappropriation claim. See id. (finding that the plaintiff had not demonstrated a likelihood of success on the merits of its MUTSA claim because the plaintiff "[did] little more than name the design, processes, and machines" that allegedly constituted trade secrets). For example, in NewLeaf Designs, LLC v. BestBins Corp., the plaintiff sought a preliminary injunction to protect its "customer lists, marketing intelligence, business plans, supplier information, and operating information" as trade secrets under the MUTSA. 168 F. Supp. 2d 1039, 1043 (D. Minn. 2001). However, because the plaintiff "provide[d] little detail as to the specific information in each of these categories," the court found that the plaintiff was unable to demonstrate a likelihood of success on the merits of its claim. Id.

Here, Plaintiffs seek to protect as trade secrets their "(1) pricing information and methods; (2) margins; (3) company suppliers; (4) customers; and (5) other information related to [AMG's] contractual relationship with SKB, including [AMG's] methods relating to the purchasing, handling, processing, and marketing of the Material and also including information regarding eddy current technology." (Pls.' Mem. at 33.) Plaintiffs

21

argue that they used this information to bid on, and win, the AMG Contract, and that the information has independent economic value by virtue of its secrecy because other companies could use it to out-bid Plaintiffs.  (Id.)  Defendants, on the other hand, argue that these categories are too broadly defined to identify trade secrets warranting protection under the MUTSA.  (See Def. M. Goodwald's Mem. of Law in Opp. to Mot. for Temp. Restraining Order and Prelim. Inj. [Doc. No. 22] ("M. Goodwald Opp.") at 13; Def. SKB's Mem. of Law in Opp. to Mot. for Temp. Restraining Order and Prelim. Inj. [Doc. No. 25] ("SKB Opp.") at 12; Defs.' Gem-Ash, 4G Group, C. Goodwald, and J. Goodwald's Mem. of Law in Opp. to Mot. for Temp. Restraining Order and Prelim. Inj. [Doc. No. 28] ("Gem-Ash Opp.") at 9–11.)

The Court agrees with Defendants.  Plaintiffs have simply asserted that several categories of information constitute trade secrets without providing any detail about the information in each of those categories.  Accordingly, the Court is unable to determine on the present record whether the information is generally known or readily ascertainable or derives independent economic value from its secrecy.  Moreover, Plaintiffs have failed to describe what reasonable efforts they have undertaken to maintain the secrecy of that information.  Because Plaintiffs have failed to adequately demonstrate the existence of any trade secrets warranting protection under the MUTSA, they are unable to show a likelihood of success on the merits of their claim.

### 2.      Usurpation of corporate opportunity

In Count V, Plaintiffs assert a claim for usurpation of corporate opportunity against CJ and Matthew.  (Compl. ¶¶ 83–89.)  To establish usurpation of corporate

opportunity under Minnesota law, a plaintiff must show "(1) that the business opportunity is also a corporate opportunity; and (2) that the alleged usurper should be held liable because he or she has violated duties of loyalty, good faith, and fair dealing toward the corporation." Aboud v. Dyab, No. A06-1937, 2008 WL 313624, at *11 (Minn. Ct. App. Feb. 5, 2008) (citing Miller v. Miller, 222 N.W.2d 71, 81 (Minn. 1974)). Whether a business opportunity belongs to the corporation depends on whether the opportunity "is of sufficient importance" and is "closely related to the existing or prospective activity of the corporation." Miller, 222 N.W.2d at 81. Relevant inquiries include:

> [1] [w]hether the business opportunity presented is one in which the complaining corporation has an interest or an expectancy growing out of an existing contractual right; [2] the relationship of the opportunity to the corporation's business purposes and current activities—whether essential, necessary, or merely desirable to its reasonable needs and aspirations; [3] whether . . . the opportunity embraces areas adaptable to its business and into which the corporation might easily, naturally, or logically expand; [4] the competitive nature of the opportunity—whether prospectively harmful or unfair; [5] whether the corporation . . . has the financial ability to acquire the opportunity; and [6] whether the opportunity includes activities as to which the corporation has fundamental knowledge, practical experience, facilities, equipment, personnel, and the ability to pursue.

Id.

Plaintiffs contend that the contract with SKB for ferrous metals recovered from the HERC facility, as well as "additional business opportunities with SKB relating to the processing and marketing of non-ferrous metals," constitute corporate opportunities belonging to Plaintiffs. (Compl. ¶¶ 84–86.) In support of their argument, Plaintiffs state that they "had the financial ability and resources, . . . fundamental knowledge, experience, facilities, personnel[,] equipment, and ability to implement" these

opportunities, (id.¶ 85; see id. ¶ 86); that Bay Side and AMG were both involved in the non-ferrous metals business, (Pls.' Mem. at 26); and that Bay Side has an eddy current machine, (id.).  CJ, on the other hand, argues that consideration of the Miller factors demonstrates that extraction of ferrous and non-ferrous metals from incinerator bottom ash was not a corporate opportunity belonging to Plaintiffs because there was no contractual expectancy for such business, neither Plaintiff is in the business of extracting metals from incinerated bottom ash, the necessary processes and equipment are very different from those used by Plaintiffs, and Plaintiffs apparently are in financial trouble. (Gem-Ash Opp. at 6–7.)

Given the limited evidence presented by Plaintiffs at this stage of the proceedings, the Court is persuaded by Defendants' argument.  Regarding the contract with SKB for ferrous metals recovered from the HERC facility, the Court notes that Gem-Ash is not the holder of that contract and that Plaintiffs were given the opportunity to submit a proposal for that business.  Therefore, neither CJ nor Matthew can be said to have usurped that opportunity.  As for opportunities with SKB relating to the processing and marketing of non-ferrous metals, Plaintiffs make no attempt beyond conclusory statements to demonstrate that those opportunities belonged to them.  Importantly, they make no attempt to argue that they had an interest in the opportunities stemming from an existing contractual right.  And, indeed, the only prior contractual relationship between AMG and SKB (i.e., the AMG Contract) dealt with the purchase of ferrous, rather than the extraction of non-ferrous, metals.  Nor do Plaintiffs explain in any detail how their current involvement in the non-ferrous metals business and their possession of an eddy

24

current machine provide them with the specific knowledge and technology necessary to pursue the extraction of non-ferrous metals from incinerator bottom ash.  Accordingly, the Court finds that Plaintiffs—at this point—have not sufficiently demonstrated a likelihood of success on their usurpation of corporate opportunity claim to warrant injunctive relief.

### 3.      Breach of the Employment Agreement

In Count I, Plaintiffs bring a claim against Matthew for breach of his Employment Agreement.  (Compl. ¶¶ 55–61.)  Plaintiffs allege that Matthew breached his obligations under the Agreement by "actively working to open a competing business in violation of the Employment Agreement and to steal Plaintiffs' current business with SKB, as well as future business opportunities with SKB."  (Pls.' Mem. at 32.)  In support of these allegations, Plaintiffs point to the July 2013 email and Nondisclosure Agreement (between SKB and 4G Group, of which Matthew is part-owner), which were forwarded to Matthew; the August 2013 email regarding the proposed University of Minnesota research project, which was forwarded to Matthew; the September 2013 email chain in which Matthew commented on the name "Gem-Ash"; the Letter of Intent signed by 4G Group; and Matthew's attempt to be released from his Employment Agreement and representation that he did not have another specific employment opportunity in mind. (Id. at 30–31.)

Matthew, on the other hand, argues that the restrictive covenants in his Employment Agreement are unenforceable because they were not supported by adequate consideration.  (See M. Goodwald Opp. at 9–11.)  More specifically, he asserts that he did

not learn that he would be required to sign a non-competition agreement until after he had accepted the job with Bay Side and, therefore, independent consideration for the non-competition agreement was required.  (See id. at 10.)  In addition, Matthew argues that the non-competition agreement is unenforceable because Plaintiffs did not enforce similar restrictive covenants against other employees.  (See id. at 11–12.)  At the hearing on this matter, Matthew's counsel also argued that Plaintiffs' evidence fails to establish any breach of the Employment Agreement.  Although Matthew was copied on correspondence and asked for his opinion about the name "Gem-Ash," his counsel argued, Matthew removed himself from those discussions and there is no evidence of any further involvement by Matthew with Gem-Ash.

The Court finds the questions of adequacy of consideration and breach to be too close to warrant preliminary injunctive relief based on this claim.  Under Minnesota law, if an employee is not informed that he must sign a non-competition agreement until after he has accepted an employment offer, that non-competition agreement must be supported by independent consideration.  Sanborn Mfg. Co. v. Currie, 500 N.W.2d 161, 164 (Minn. Ct. App. 1993).  Given Matthew's insistence that he was not informed of the non-competition agreement until after he had accepted the offer of employment from Bay Side, and given that the date of Matthew's signature on the letter notifying Matthew that he would be required to execute a non-competition agreement corroborates his story, it is not sufficiently evident on this record that the non-competition agreement was enforceable.

In addition, Plaintiffs have failed to demonstrate a sufficient likelihood that Matthew breached the Agreement.  Other than Matthew's comment regarding the name "Gem-Ash," there is no evidence that Matthew has had any involvement with that company.  Although Plaintiffs have shown that other individuals copied Matthew on a few pieces of correspondence, such passive involvement is insufficient to warrant injunctive relief in light of the contradictory evidence that Matthew immediately removed himself from those discussions.  Even less sufficient to demonstrate wrongful conduct is Matthew's desire to be released from the restrictive covenants.  On the contrary, his request signals that he was aware of his obligations.  Although discovery may prove to provide further support for Plaintiffs' claim of breach, Plaintiffs' strongest evidence, on this record, of a breach is 4G Group's participation in the Nondisclosure Agreement and Letter of Intent.  Given Jerry's and CJ's assertions that 4G Group has not taken any other actions related to this business venture, however, the Court finds Plaintiffs' evidence at this stage to be insufficient to demonstrate a likelihood of success on their claim.

### 4.      Breach of fiduciary duties

In Count IV, Plaintiffs allege that Matthew and CJ breached the duties of loyalty and confidentiality that they owed to Plaintiffs by virtue of their employment.  (Compl. ¶¶ 76–82.)

### a.      Duty of loyalty

Under Minnesota law, an employee owes to his employer a duty of loyalty, which "prohibits him from soliciting the employer's customers for himself, or from otherwise competing with his employer, while he is still employed."  Eaton Corp. v. Giere, 971

F.2d 136, 141 (8th Cir. 1992) (citing <u>Rehabilitation Specialists, Inc. v. Koering</u>, 404

N.W.2d 301, 304 (Minn. 1987)).  However, "[t]his duty does not prevent an employee

from preparing to enter competition with the employer while still employed."  <u>Schlief v.

Nu-Source, Inc.</u>, Civ. No. 10-4477 (DWF/SER), 2011 WL 1560672, at *6 (D. Minn. Apr.

25, 2011) (citing <u>Rehabilitation Specialists, Inc.</u>, 404 N.W.2d at 304).

      Plaintiffs argue that Matthew and CJ breached their duty of loyalty by competing

with Plaintiffs during their employment.  (<u>See</u> Pls.' Mem. at 23.)  Specifically, Plaintiffs

rely on Matthew's ownership interest in 4G Group, his purported solicitation of SKB, and

his participation in the formation of Gem-Ash.  (<u>Id.</u>)  And, Plaintiffs argue that CJ

"embarked on a business venture to usurp both a long-standing business relationship and

a future opportunity of AMG."  (<u>Id.</u>)  Plaintiffs point to CJ's participation in the

September 2013 meeting at the landfill, his signature on the Nondisclosure Agreement,

his involvement with the Letter of Intent, and his failure to bring the non-ferrous metal

recovery opportunity to Plaintiffs' attention.  (<u>See</u> <u>id.</u> at 23–24.)

      In opposition, Matthew argues that Plaintiffs have failed to present evidence—

other than fragments of email conversations—to substantiate their claim.  (<u>See</u> M.

Goodwald Opp. at 14.)  He also argues that there is a difference between competing with

an employer and preparing to compete with an employer in the future and that, at any

rate, he severed any connection that he had with Gem-Ash in order to abide by his

Employment Agreement.  (<u>See</u> <u>id.</u>)  CJ maintains that Gem-Ash's business of extracting

metal from incinerated bottom ash is very different from Plaintiffs' business, and so he

28

did not usurp anything from Plaintiffs.  (See Gem-Ash Opp. at 5 n.2; C. Goodwald Decl. ¶ 13.)

Plaintiffs' allegations regarding Matthew's breach of the duty of loyalty are based on the same facts that form the basis of their claim against him for breach of the Employment Agreement.  As discussed above, Plaintiffs have failed to present sufficient evidence to demonstrate that Matthew was involved with Gem-Ash or Gem-Ash's dealings with SKB, or that 4G Group had any material involvement in that business venture.  Accordingly, the Court finds that Plaintiffs' evidence—on this record—also is insufficient to demonstrate a likelihood of success on their breach of duty of loyalty claim against Matthew.

Similarly, Plaintiffs' allegations regarding CJ's breach of the duty of loyalty are based on the same facts that form the basis of their claim against him for usurpation of corporate opportunity.  As discussed above, Gem-Ash is not the holder of the ferrous metals contract, and Plaintiffs were given the opportunity to submit a proposal for that business.  Moreover, Plaintiffs have not sufficiently demonstrated that they are—or could be—in the business of extracting non-ferrous metals from incinerator bottom ash. Accordingly, CJ cannot be said to have usurped that "long-standing business relationship" or a "future opportunity of AMG."  Because Plaintiffs have failed to provide sufficient evidence that CJ was competing with them, they have not demonstrated a sufficient likelihood of success on their breach of duty of loyalty claim against CJ.

### b.  Duty of confidentiality

An employee also owes to his employer a duty of confidentiality, which prohibits him from "us[ing] trade secrets or confidential information obtained from [his] employer." Eaton Corp., 971 F.2d at 141 (citing Jostens, Inc. v. Nat'l Computer Sys., 318 N.W.2d 691, 701 (Minn. 1982)).  In order for this duty to arise, "an employee [must be] given notice that material is confidential." Schlief, 2011 WL 1560672, at *6 (citing Jostens, Inc., 318 N.W.2d at 702).

Plaintiffs argue that Matthew and CJ breached their duty of confidentiality by using Plaintiffs' information regarding pricing, margins, suppliers, customers, contracts, and eddy current technology to create their own business opportunity and contract with SKB.  (See Pls.' Mem. at 25.)  In response, Matthew and CJ argue that Plaintiffs have not adequately identified their alleged trade secrets or established that Matthew and CJ knew of, or used, any of them.  (See M. Goodwald Opp. at 13–14; Gem-Ash Opp. at 9–11 & n.3.)

The Court finds that Plaintiffs have failed to demonstrate a likelihood of success on their claim for breach of the duty of confidentiality.  As discussed above, Plaintiffs have not sufficiently described the information that they claim is confidential or constitutes a trade secret.  Similarly, it is not evident from the record that Defendants notified Matthew and CJ that particular information was confidential.  Accordingly, preliminary injunctive relief based on this claim is inappropriate.

### 5.    Breach of the AMG Contract

In Count II, Plaintiffs allege that SKB breached the following provision of the

AMG Contract:  "Thirty days prior to the end of the Term, SKB shall solicit competitive

bids for the subsequent bid."  (Compl. ¶¶ 62–66; <u>see</u> Rogers Decl., Ex. 1, at 2; Pls.' Mem.

at 35.)  To establish breach of contract under Minnesota law, a plaintiff must show

"'(1) formation of a contract; (2) performance by plaintiff of any conditions precedent;

(3) a material breach of the contract by defendant; and (4) damages.'"  <u>Gen. Mills</u>

<u>Operations, LLC v. Five Star Custom Foods, Ltd.</u>, 703 F.3d 1104, 1107 (8th Cir. 2013)

(citation omitted).

Here, Plaintiffs assert that SKB breached the Contract by failing to solicit

competitive bids on or before October 2, 2014 for the subsequent bid.  (Pls.' Mem. at 35.)

According to Plaintiffs, had SKB complied with the contract, Plaintiffs "likely" would

have won the bid.  (<u>Id.</u>)  SKB, on the other hand, argues that it did not solicit bids

because it was aware that the contract upon which the AMG Contract was based (i.e., the

Hennepin County Metals Contract) was set to expire on October 31, 2014.  (SKB Opp. at

11.)  Accordingly, SKB asserts, any alleged breach was immaterial because Hennepin

County ultimately removed the requirement for competitive bidding.  (<u>See id.</u> at 11–12.)

SKB further argues that Plaintiffs' allegations that they "likely" would have won the bid

are insufficient to demonstrate actual damages.  (<u>Id.</u> at 11.)

The Court finds that Plaintiffs have not proffered sufficient evidence of materiality

or damages at this stage to demonstrate a likelihood of success on the merits of this

claim.  Although SKB did not solicit bids by October 2 for the purchase of the HERC

facility metals in the upcoming term, SKB did inform AMG on October 28 that SKB

would begin accepting proposals for the same.  And, on October 31, SKB issued a formal

RFP to that effect.  Plaintiffs have failed to demonstrate why that three-and-a-half week

delay was material or how it caused them to suffer damages.  Moreover, Plaintiffs have

failed to submit a proposal in response to the RFP, allegedly because they are unable to

match the minimum price.  Accordingly, Plaintiffs have not demonstrated that they

"likely" would have won the bid.  Finally, because SKB has received several responses

from companies indicating their intent to meet or exceed the minimum price requirement

in the RFP, Plaintiffs have failed to establish that they would have fared better under the

competitive bidding process than under the RFP process with its minimum price

requirement.  For these reasons, Plaintiffs have not shown a fair chance of prevailing on

the merits of their breach of contract claim against SKB.

### 6.      Tortious interference

Finally, in Counts VI through VIII, Plaintiffs allege tortious interference with the

Employment Agreement, tortious interference with the AMG Contract, and tortious

interference with prospective business advantage, respectively.  (Compl. ¶¶ 90–111.)  To

succeed on a claim for tortious interference with contract under Minnesota law, a plaintiff

must show:  "'(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of

the contract; (3) intentional procurement of its breach; (4) without justification; and

(5) damages.'"  Peterson v. Cnty. of Dakota, Minn., 479 F.3d 555, 559 (8th Cir. 2007)

(quoting Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc., 325 N.W.2d 20,

25 (Minn. 1982)).  And, to recover for tortious interference with prospective business

advantage, a plaintiff must prove:  (1) the existence of a reasonable expectation of economic advantage; (2) the defendant's knowledge of that expectation; (3) the defendant's intentional and wrongful interference with that expectation; (4) a reasonable probability that the plaintiff would have realized the economic advantage in the absence of the defendant's wrongful act; and (5) damages.  Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc., 844 N.W.2d 210, 219 (Minn. 2014).  While the evidence may later demonstrate otherwise, Plaintiffs have failed at this stage to show a likelihood of success on their claims.

   **a.**  **Tortious interference with the Employment Agreement**

  First, Plaintiffs argue that Gem-Ash, 4G Group, CJ, Jerry, and SKB were aware of Matthew's Employment Agreement, but that they nevertheless continued to involve Matthew in improper activities, such as execution of the Nondisclosure Agreement and Letter of Intent.  (Pls.' Mem. at 37.)  Plaintiffs assert that these activities caused Matthew to breach the Agreement and that they were damaged by Matthew's facilitation of the relationship between SKB and Gem-Ash.  (Id.)  According to Plaintiffs, absent that relationship, Plaintiffs likely would have been awarded the future SKB contracts.  (Id.)  Gem-Ash, 4G Group, CJ, Jerry, and SKB argue that, contrary to Plaintiffs' conclusory statements, they were not aware of the Employment Agreement until around September or October 2013, and once they did learn of the Agreement, they ensured that Matthew was not involved in their discussions and negotiations.  (See Gem-Ash Opp. at 12; SKB Opp. at 15.)

The Court finds that Plaintiffs have failed—on this record—to demonstrate a likelihood of success on this claim because they have not offered any concrete evidence to support their conclusory statements regarding Defendants' knowledge of the Agreement.  Rather, the only evidence before the Court supports Defendants' position.  While Plaintiffs may eventually discover evidence that these Defendants were, in fact, aware of the Employment Agreement from the outset or that they failed to completely cut Matthew out of their discussions and negotiations after learning of the Agreement, preliminary injunctive relief is not appropriate on the current record.

### b. Tortious interference with the AMG Contract

Second, Plaintiffs argue that, although Gem-Ash, 4G Group, CJ, Matthew, and Jerry were aware of the AMG Contract, they intentionally procured SKB's breach of the competitive bid provision by seeking a ten-year contract with SKB.  (Pls.' Mem. at 38.) On the other hand, Defendants argue that there is no evidence that they had any influence on SKB's decisions regarding the bidding process.  (Gem-Ash Opp. at 12–13.)

As discussed above, Plaintiffs have failed to demonstrate a likelihood of success on their breach of contract claim against SKB, in part because SKB ultimately allowed them to submit a bid for the upcoming term.  For the same reasons, the Court finds that Plaintiffs also are unable to demonstrate a likelihood of success on their claim that Defendants tortiously interfered with that Contract.

### c. Tortious interference with prospective business advantage

Third, Plaintiffs assert that they reasonably expected to be awarded a renewal of the AMG Contract, given their expertise and prior relationship with SKB.  (Pls.' Mem. at

38.)  Plaintiffs claim that, despite their knowledge of this reasonable expectation, CJ, Matthew, Jerry, Gem-Ash, and 4G Group wrongfully interfered by forming a relationship with SKB and attempting to steal the Contract and other expanded opportunities.  (Id. at 38–39.)  But for that conduct, Plaintiffs argue, they would have been awarded another contract that included the expanded opportunities.  (Id. at 39.)  Defendants, on the other hand, argue that there is no evidence of interference and that, at any rate, SKB has invited AMG to bid on the ferrous metals business that was the subject of the expired AMG Contract.  (Gem-Ash Opp. at 13.)

For the same reasons that Plaintiffs have failed to demonstrate a likelihood of success on their breach of contract claim against SKB (i.e., Plaintiffs ultimately were allowed, but declined, to bid on the ferrous metals business for the upcoming term) and their usurpation of corporate opportunity claim (i.e., Plaintiffs have not shown a business expectancy in the opportunity or that they possessed the necessary knowledge and ability to perform), the Court finds that Plaintiffs also are unable to demonstrate a likelihood of success on their claim for tortious interference with prospective business advantage.

**B.     Irreparable Harm**

In addition, Plaintiffs have not demonstrated a sufficient threat of irreparable harm to warrant preliminary injunctive relief in this case.  "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."  Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2009).  "[T]he threat of unrecoverable economic loss due to a company's bankruptcy or insolvency" may be sufficient.  Hollywood Healthcare Corp. v.

Deltec, Inc., No. Civ. 04-1713 (RHK/AJB), 2004 WL 1118610, at *11 (D. Minn. May

17, 2004) (citation and internal quotation marks omitted).  However, a party seeking

preliminary injunctive relief must demonstrate that "the harm is certain and great and of

such imminence that there is a clear and present need for equitable relief."  Novus

Franchising, Inc. v. Dawson, 725 F.3d 885, 895 (8th Cir. 2013) (citation and internal

quotation marks omitted).  Failure to do so is grounds for denying an injunction.  Watkins

Inc., 346 F.3d at 844.

    Plaintiffs argue that there is a presumption of irreparable harm when a non-

competition agreement is breached and that, at any rate, they will suffer the following

harms in the absence of an injunction:  Matthew's release from his contractual

obligations; the continued exposure of Plaintiffs' trade secrets to third parties; the loss of

the contract on which their economic viability depends; the likely cessation of Plaintiffs'

operations and subsequent laying off of twenty-four employees; the inability to submit a

proposal for the recovery of ferrous and non-ferrous metals; and the loss of a critical

business opportunity to their former employees.  (Pls.' Mem. at 19–20.)  Plaintiffs further

assert that, even if a money judgment would otherwise be an appropriate remedy for

these harms, it is insufficient in this case because Gem-Ash is a start-up entity that will

not have the resources to pay an award of damages.  (Id. at 20–21.)

    In opposition, Defendants argue that these harms are either non-existent or are not,

in fact, irreparable.  First, Matthew asserts that he is not involved in Gem-Ash and

intends to honor his Employment Agreement, and that Plaintiffs have failed to provide

evidence to the contrary.  (M. Goodwald Opp. at 15–16.)  Second, SKB argues that the

AMG Contract expired by its own terms, and AMG was not guaranteed a renewal.  (SKB Opp. at 18.)  Even so, SKB points out, Gem-Ash has disclaimed any right to purchase the materials that were the subject of the AMG Contract, and SKB has invited AMG to submit a proposal for the purchase of those materials.  (<u>Id.</u> at 17.)  Moreover, SKB argues, Plaintiffs have failed to put forth any evidence that SKB interfered with Matthew's Employment Agreement or misappropriated any trade secrets, and all of the alleged harms occurred in the past and can be compensated with money damages.  (<u>Id.</u> at 18–19.)  Finally, the remaining Defendants similarly argue that AMG was afforded the opportunity to continue its relationship with SKB and that Gem-Ash is not competing for that business, that Plaintiffs have failed to identify their alleged trade secrets or demonstrate that Gem-Ash has acquired such information, and that Plaintiffs have failed to explain why money damages would be insufficient to remedy any of the alleged harms or that Gem-Ash would be unable to satisfy a money judgment.  (Gem-Ash Opp. at 14–16.)

The Court agrees with Defendants.  As discussed above, Plaintiffs have not put forth sufficient evidence—on this record—that Matthew breached the terms of his Employment Agreement or that he intends to do so.  Nor have Plaintiffs identified—in more than a conclusory fashion—the trade secrets that Defendants have allegedly appropriated, let alone any evidence that those trade secrets have been exposed to third parties.  Accordingly, these alleged harms are based on speculation and are insufficient to constitute irreparable harm.

As for Plaintiffs' loss of the AMG Contract, that contract expired on its own terms and SKB did issue an RFP for business related to the New Hennepin County Metals Contract in the following period.  Thus, AMG received the process to which it was entitled, even if it did not receive the outcome it desired.  Even so, loss of that contract is a harm that can be compensated for by money damages.  Should Plaintiffs be required to cease operations and lay off employees due to loss of that contract, those harms, too—if wrongfully caused by Defendants—can be compensated through an award of damages.[8] Plaintiffs have not presented evidence to the contrary.

Finally, Plaintiffs have offered no evidence that Gem-Ash is bankrupt or insolvent or would otherwise be unable to pay an award of damages in the event that it ultimately is found to be at fault.  Therefore, the Court finds that Plaintiffs have failed to demonstrate a sufficient threat of harm that is certain, imminent, and not compensable by money damages.

### C.   Balance of Harms

As for the balance of harms, a court must compare the harm that will result to the moving party if relief is denied with the harm that will result to the other litigants if the relief is granted.  See Dataphase Sys., Inc., 640 F.2d at 114.  Here, Plaintiffs claim that any harm to Defendants that would result from a preliminary injunction would be minimal because the parties could develop the case "without radical changes to [their] existing obligations, SKB would continue to receive revenues under the AMG Contract,

---

[8]     In addition, while the loss of jobs for twenty-four individuals would be extremely unfortunate, the Court notes that the resulting harm is more likely characterized as harm to those individuals, rather than harm to Plaintiffs.

and Gem-Ash has not begun its performance under the Gem-Ash Contract and "presumably has not incurred significant expenses to date."  (Pl.'s Mem. at 21.)

On the other hand, SKB asserts that the relief Plaintiffs seek would require the Court to force the assignment of a contract relating to a service completely different than the one AMG previously provided to SKB, and that such relief would be "extremely harmful to . . . its freedom to contract and choose its own service providers."  (See SKB Opp. at 20.)  Likewise, Gem-Ash argues that an injunction would cause it material harm because the Gem-Ash Contract is its only contract, and it has already invested $1.85 million in its business.  (See Gem-Ash Opp. at 16–17.)  On the contrary, Gem-Ash notes, "Plaintiffs are in precisely the same position they contracted to be in:  [AMG] has an expired contract and an opportunity to bid on a renewal.  And Plaintiffs never had any contract with SKB . . . to extract metals from incinerated bottom ash at a . . . landfill."  (Id. at 16.)

The Court finds that some of the parties will suffer material financial damage whether an injunction is granted or denied.  However, it appears that granting an injunction would alter—rather than maintain—the status quo, where the AMG Contract has expired on its own terms and the Gem-Ash Contract relates to a different service. Accordingly, contrary to Plaintiffs' argument, enforcing an injunction would cause the parties to make "radical changes to [their] existing obligations."  Therefore, the balance of harms weighs in favor of Defendants.

### D.    Public Interest

Finally, the public interest is best served by denying the injunction.  Although Plaintiffs and Defendants have asserted valid interests (i.e., upholding valid contracts and protecting legitimate business interests, (see Pls.' Mem. at 39–40); versus limiting contracts to their express terms, (see SKB Opp. at 21), and protecting the environment, (see Gem-Ash Opp. at 17–18)), the Court finds that this factor weighs against awarding the requested injunctive relief in light of Plaintiffs' failure to demonstrate a likelihood of success on the merits of their breach of contract and misappropriation claims.

## IV.    CONCLUSION

In conclusion, the Court finds that the preliminary injunctive relief requested by Plaintiffs is inappropriate, particularly in light of Plaintiffs' failure to demonstrate a threat of irreparable harm.  In addition, although the record—once developed—may show that Plaintiffs are entitled to prevail on all of their claims, the present record does not demonstrate a likelihood of success on any of these claims that is sufficient to merit an award of preliminary injunctive relief.  Finally, the balance of harms and public interest weigh slightly in favor of Defendants.  Accordingly, the Dataphase factors support denial of a preliminary injunction in this case.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  Plaintiffs' Motion for Expedited Discovery [Doc. No. 10] is **DENIED AS MOOT**; and

2.  Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction [Doc. No. 13] is **DENIED**.


Dated:  December 1, 2014          s/Susan Richard Nelson
                                  SUSAN RICHARD NELSON
                                  United States District Judge